Filed 3/5/21  In re T.K. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re T.K., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>T.K.,<br><br>    Defendant and Appellant. | G059423<br><br>(Super. Ct. No. 20DP0280)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gary L. Moorhead, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

In March 2020, mandatory reporters observed several bruises on six-year-old T.K.'s shoulders. When asked about them, T.K. said his father had hit him. The incident was reported to Orange County Social Services Agency (SSA), which investigated and determined that T.K.'s father had physically abused him. SSA also found T.K.'s mother knew about the incident but had failed to take any action. T.K. was taken into protective custody and later placed with his maternal grandparents. SSA filed a juvenile dependency petition under Welfare and Institutions Code section 300.[1] The juvenile court found the allegations in the petition to be true at a combined jurisdiction and disposition hearing. It also found a substantial risk of harm to T.K. if he was returned home, so it ordered that he remain removed from his parents' custody while they engaged in reunification services.

T.K.'s father appeals, arguing there was insufficient evidence to justify the juvenile court's removal of T.K. from the parents' home. We disagree. T.K. told numerous people that his father had inflicted the bruises at issue and that his father frequently hit him, sometimes using a belt, stick, or phone. T.K. also reported that his mother knew of the abuse but had done nothing to stop it. The court found T.K.'s story to be credible, and we do not question this finding on review. Further, the father admitted to hitting T.K. with a belt, pushing him to the ground, and making him run for up to four hours as punishment for misbehaving. Thus, we affirm the court's order.

I

FACTS

*A. Prior Allegations of Abuse*

T.K. was born in July 2013. The child abuse report at issue was received by SSA on March 2, 2020. Before turning to that report, several prior reports provide

---

[1] All further statutory references are to the Welfare and Institutions Code.

vital context. The first was made in December 2018, when a reporter informed SSA that T.K. had a two-inch bruise on the left side of his face. T.K. told the reporter his father had pushed him at home, causing him to fall and hit his head on the carpet. T.K.'s parents claimed he had tripped and slid face first on the carpet while trying to avoid a spanking from his father. When interviewed by SSA, T.K. said he felt safe at his parent's home. SSA found this report to be unfounded.

Another reporter told SSA in October 2019 that T.K. had said he wanted to die because his father frequently hit him with a belt on his backside. During SSA's investigation, T.K. denied saying this. T.K. and both parents asserted the father only spanked T.K. on the buttocks with an open hand. SSA again found this report to be unfounded.

In February 2020, SSA received duplicate referrals from two separate reporters that T.K. had a bruise on his forehead. T.K. told both reporting parties the bruise "was a secret" between him and his parents. He eventually gave multiple explanations for the injury. He initially told both reporters he had tripped in the bathroom at home and hit his head on the toilet. But he later told the first reporter he had tripped while running and fallen onto the grass. And he later told the second reporter that he had hit a pole at school. Both parents claimed T.K. had told them the bruise on his forehead resulted from him slipping in the bathroom and hitting his head on the toilet. SSA's report for this incident noted, "[i]n the past, when [T.K.] would sustain injuries, he would say that it was caused at school; however, there has never been records of [T.K.] reporting the injuries at school. All students are required to report incidents, especially if injuries were sustained, to the school." Still, SSA found the report to be inconclusive.

## B. The Underlying Incident

On March 2, 2020, the reporting party observed bruises on T.K.'s shoulders. One bruise was about the size of a hand palm. T.K. did not want to discuss

3

the injuries with the reporter because he was scared his father would go to jail. But he eventually explained that he had gotten in trouble with his father for misbehaving at school. His father made him do pushups as punishment. T.K., who was six years old at the time, was unable to do them, so his father hit him in the back with a closed fist about 11 times. His father also pushed him down onto the ground, bruising T.K.'s knees. T.K. said he was afraid of his father. Another mandatory reporter made a duplicate referral after seeing a hand-sized bruise on T.K's right shoulder. T.K. told the second reporter his father had punched him and that he was afraid of his father.

After SSA received these reports, social worker T. Nguyen interviewed T.K. later that day at school.[2] T.K. showed her marks and bruises on his back, shoulders, knees, shins, and right arm. He largely repeated the story he had told the reporters. When T. Nguyen asked T.K. to demonstrate what his father had done on a bag, T.K. said "'he did like this'" and repeatedly punched the bag with his right fist. He also clarified that his father picked him up and pushed him to the ground when he was unable to do a push-up, which bruised T.K.'s kneecaps. His father told T.K. he had to "'pay the price for what [he] did.'" T. Nguyen recorded a prominent bruise on T.K.'s right shoulder measuring about six by eight centimeters, and she noted some of the marks appeared to be "the marks of the knuckles when a person is hit with a closed fist."

T.K. informed T. Nguyen that his mother did not use corporal punishment. She had seen his shoulder bruises and talked to his "father about being physical towards" T.K., but T.K. did not know the specifics of their conversation. He declared that he did "not want to see [his] father 'because he hurt me, he made me cry.'" T.K. did not feel safe around his father and divulged that his father hit him nearly every day with either a

_____

[2] Social worker J. Nguyen later became involved in this case too. To avoid confusion and for anonymity purposes, we use first name initials and last names for all social workers involved.

4

belt, stick, or his hand. His father also made him run laps in their yard for long periods of time as punishment.

Fullerton Police Officer Kyle Bishop also interviewed T.K. at school that day. T.K. repeated the story he had told T. Nguyen and specified the incident had occurred around February 26, at his father's work warehouse.[3] He again stated that his father sometimes hit him with a belt or wooden stick and made him run for hours. If T.K. told his father that he was in pain, his father said he "'ha[d] to pay the price.'"

T.K.'s mother was telephonically interviewed that day by T. Nguyen. The mother confirmed she had seen the bruises on T.K.'s upper back but believed he had gotten them from falling during an ice skating lesson. She also claimed the father only spanked T.K. on the buttocks area and denied any knowledge of T.K. being hit elsewhere.

Officer Bishop interviewed T.K.'s father when he came to pick up T.K. at school that day.[4] The father denied punching T.K. and suggested the bruises could be from falls T.K. had during ice skating lessons. But he also informed Bishop that when he had asked T.K. about the bruises, T.K. "told him that he [the father] pushed him and punched him on the back." The father then told Bishop he was "'pretty sure'" he had not done that. The father also confessed to recently hitting T.K. on the buttocks with a belt, causing three marks, and to pushing T.K. to the ground when he tried to avoid being hit with the belt. He further also disclosed that he made T.K. run for up to four hours if he misbehaved.

After the interview, officer Bishop arrested T.K.'s father for child cruelty. He was later released on bond and was never criminally charged. T.K. was taken into

_____

[3] T.K.'s father owns a business and has a warehouse in Garden Grove.

[4] At some point during this interview, T. Nguyen entered the classroom where the interview was occurring and conducted a joint interview with officer Bishop.

protective custody that day and later placed with his maternal grandparents. On March 4, SSA filed a juvenile dependency petition under section 300, subdivisions (a) and (b)(1). The petition alleged T.K.'s father had physically abused T.K. and his mother knew of the abuse. At the initial hearing the next day, the juvenile court found T.K. needed to be removed from his parents' home. The court order supervised visitation for the mother and monitored visitation for the father. A jurisdiction hearing was initially set for April 2020 but was continued several times.

## C. SSA's Progress Reports

Social workers' J. Nguyen and Edwards were assigned as caseworkers. They filed several reports in the juvenile court, which included summaries of interviews with T.K., his parents, and various relatives. Their reports recommended that SSA's petition be sustained and that T.K. remain with his maternal grandparents while his parents engaged in reunification services.

### 1. Interviews with T.K.

On March 4, 2020, T.K. underwent a forensic examination conducted by Dr. Van Nguyen Greco of the Child Abuse Services Team (CAST) Medical Unit. When she asked T.K. about the bruises on his back, T.K. repeatedly responded, "'I can't tell you, I don't want my dad to be in jail.'" She also asked T.K. about a bruise on his forehead (this appears to be the bruise from the February 2020 report). T.K. stated his father had hit his face with a phone. Dr. Greco recommended that T.K. have a forensic interview.

An in-person forensic interview of T.K. was conducted the next day. At the beginning of the interview, T.K. stated "'[m]y mom said if I say something about my shoulder and back, my dad will be in jail forever.'" When the CAST interviewer asked him to describe something he did not like, T.K. stated "'that my dad hits me.'" He then,

6

without prompting, showed the interviewer his back and shoulders and stated "'my dad punched me,'" while pointing to his shoulders. He added, the punches were "'really hard.'" T.K. said he showed the bruises to his mother and she confronted his father about them, but he did not know what they discussed.

T.K. also told the CAST interviewer that when he gets into trouble, his father made him run "'around the course, all day, all day, all day,'" and that he was not given anything to eat or drink while running. If T.K. did not run, his father would "'chas[e] [him] with a stick and hit[] [him]." His father usually hit him on the buttocks with a belt, stick, or phone. T.K. described the stick as blue and being part of a "sweeper." When asked about the belt, T.K. without prompting demonstrated the whipping motion with his hand while saying "'[w]hip it, [w]hip it.'" He also added that this father hit him in the stomach and on the face with a phone at times and that his mother sometimes saw the abuse.

Edwards interviewed T.K. on March 26 via video call due to COVID-19 health precautions. During the interview, Edwards asked T.K. if there was anything he did not like about his family. T.K. responded, "'my dad hitting me when I am in trouble.'" Similar to prior interviews, T.K. stated that when he got into trouble, his father would hit him "'with his phone, belt, [or] stick.'" He described the stick to be like a broom handle. T.K. also clarified that he had hit his head while ice skating, but when asked whether he had also hurt his back while ice skating, T.K. responded, "'no, that's my dad.'" During the interview, he again reiterated that his mother knew about the abuse but did not stop it. Still, T.K. said he missed his mother and wanted to go home with his parents.

Later that day, T.K. placed an unprompted video call to Edwards (her number was logged in T.K.'s iPad). He said he did not remember anything about his father hitting him. When Edwards asked T.K. whether anyone had told him to say that, T.K. said "'well, I was talking to my grandma and she said to just tell [Edwards] I don't

7

remember.'" J. Nguyen later spoke to the maternal grandmother in a separate call, and she denied telling T.K. to say this.

Edwards contacted T.K. by video call on April 16, 2020. He stated that he was no longer "'scared of my dad . . . because I have grown up,'" and that he missed his parents. During contacts in May and July of 2020, T.K. said he wanted to return to his parents' home. But during the July contact, he also expressed that his father "'freaked [him] out sometimes.'" In August 2020, T.K. again told J. Nguyen that he wanted to go home and commented, "'[t]he truth is the police told [*sic*] to tell that.'"

### 2. *Interviews with T.K.'s parents and relatives*

Dr. Greco spoke with T.K.'s parents on March 4. The father admitted to striking T.K. on the buttocks with a belt over four layers of clothing (two pairs of pants and two shirts). Dr. Greco noted the father would have had to hit T.K. extremely hard to leave a mark with that much clothing on. The parents also admitted the father made T.K. run for up to two hours as punishment but said he was given breaks and drinks. The father also maintained T.K. had told him the bruises on his shoulders and back were caused by kids at school hitting him. Dr. Greco concluded these bruises "appear[ed] patterned and [were] not the result of accidental trauma or normal play. They [were] the result of inflicted trauma/physical abuse and can occur from being hit with a fist multiple times." She also noted "it was possible that a much older child could have caused the bruising to [T.K.'s] back." When asked about the bruise on T.K.'s forehead (the bruise reported in February 2020), the father stated T.K. had accidentally hit his head on the toilet. Dr. Greco concluded the forehead bruise could have been accidental but could also be "consistent with being hit with a cell phone."

Edwards conducted an in-person interview of the mother on March 12, 2020. The mother denied the abuse allegations and claimed T.K. had told her the bruises on his shoulders and knees were from ice skating. She also denied that T.K. was hit

8

nearly every day and denied that he was ever hit with a stick or belt. While she confirmed the father made T.K. run, she insisted it only lasted for up to 45 minutes. The father was not interviewed, as he had invoked his Fifth Amendment right, and the juvenile court ordered that he could only be interviewed as to services and visitation.

In June 2020, J. Nguyen received a call from T.K.'s paternal grandmother. She reported witnessing T.K. being physically abused by his father on multiple occasions. She also expressed concern that T.K.'s father had anger management issues and that he abused T.K. when he was upset with T.K.'s mother. She also alleged T.K.'s mother knew about the abuse but had done nothing to stop it.

### 3. *Services*

J. Nguyen sent anger management resources to the father and parenting education resources to both parents. The father completed his parenting course, and the mother appears to have at least partially completed it by the time of the jurisdiction hearing. The father had not started the anger management course by the time of the hearing.

## D. The Hearing

A combined jurisdiction and disposition hearing commenced on August 27, 2020. T.K.'s father, mother, and ice skating coach testified.

During his testimony, T.K.'s father described his disciplinary system. Initially, he would explain to T.K. what he did wrong. Next, for recurrent issues, he would employ time-outs, early bedtimes, and "sometimes running [the family's] driveway."[5] The running ranged from 10 minutes to two hours, but he testified that T.K. was given drinks and snacks. The father denied telling police that T.K. ran for up to four

---

[5] The family's house sits on roughly one acre of land. The father estimated their driveway was about the size of four classrooms.

9

hours and alleged that officer Bishop had lied in his report. Finally, if T.K. put himself in danger or caused "bodily harm," the father would spank T.K.'s buttocks with his hand. The father invoked his Fifth Amendment right when asked if he had ever struck T.K. with a belt or stick or had ever punched him.

T.K.'s father swore he had never physically harmed T.K. And he denied knowing what had caused the bruises on T.K.'s shoulders and back. He claimed to have become aware of them on March 1, when the mother raised the issue. He testified that he then asked T.K. about the bruises, and T.K. did not say anything. T.K.'s father also denied pushing T.K. to the ground. He acknowledged telling the police about hitting T.K.'s buttocks with a belt, but he asserted "there were no marks" and blamed the police for making that up. Regardless, in his opinion, hitting a child on the buttocks and causing marks was not abuse. He further clarified that he generally only used the belt as a scare tactic.

According to the father, the paternal grandmother lied about seeing him physically abuse T.K. T.K.'s teacher lied when reporting in October 2019 that T.K. had said he wanted to die because his father regularly hit him with a belt. Similarly, the school lied in the February 2020 report. He also insisted the Fullerton Police Department and the school district had fabricated the stories of physical abuse. When asked about Dr. Greco's summary of their conversation on March 4, he denied speaking to her.

The mother testified that the father had not physically abused T.K. and loved him very much. She had never seen the father hit T.K. with a belt or stick, nor had T.K. ever told her anything to that effect. She had only seen the father threaten T.K. with a belt. The mother also denied that T.K. ran for up to four hours. She believed even running for two hours would be excessive punishment and maintained that T.K. only ran for 10 to 15 minutes.

The mother also denied T.K.'s account that his father hit him daily, claiming "my son lies all the time." Similarly, she doubted T.K.'s report that the father

10

had thrown him to the ground and punched him, asserting she "believe[d] that he testified untruthfully." Instead, she testified T.K. had told her the bruises on his knees, back, and shoulder were from ice skating lessons. But she also stated that she believed T.K. had gotten the bruises after getting beat up by several kids at school.

T.K.'s ice skating coach testified that T.K. began skating with her on February 22, 2020. She never observed the father yell at T.K., and she never saw any bruises on T.K. beyond normal bruises he would get from falling during lessons. She characterized T.K. as a frequent faller, who initially fell 30 to 60 times per lesson. He did not wear any pads or protection, other than a helmet.

*E. The Juvenile Court's Ruling*

The juvenile court found the allegations in SSA's petition to be true and declared T.K. a dependent of the court. It found T.K.'s reports of physical abuse were credible, and his parents' testimony lacked credibility. The court concluded that while both parents "clearly love [T.K] and want the best for him, . . . the father has crossed the line of socially acceptable discipline, and the mother . . . failed to protect her son from the father's excessive discipline." As such, it determined both parents would greatly benefit from engaging in counseling and other services offered by SSA.

The juvenile court also found by clear and convincing evidence that returning T.K. to the custody of his parents would be harmful to him under section 361, subdivision (c)(1). Thus, it ordered that custody of T.K. would remain vested in the director of the SSA while his parents engaged in reunification services. The father appeals this aspect of the court's ruling, arguing there was not clear and convincing evidence to support removing T.K. from his custody.

11

## II

## DISCUSSION

### A. Applicable Law

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136.) "'Reasonable apprehension stands as an accepted basis for the exercise of state power.'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

The juvenile court's findings are reviewed for substantial evidence. (*In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135-136.) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. [I]n making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; *In re V.L.*, *supra*, 54 Cal.App.5th at p. 155 [applying standard in a dependency case].)

### B. Analysis

T.K.'s father argues there were no safety concerns at the time of the hearing. Rather, T.K. had told the social workers that he felt safe and wanted to return

home.  Further, to the extent there was any danger, he contends SSA could have increased its visits to the home rather than removing T.K. from his parents' custody.  We disagree.  There was sufficient evidence for the juvenile court to conclude by clear and convincing evidence that it was highly probable T.K. would be at a substantial risk of harm if returned to his parents' custody.  Thus, T.K. needed to be removed for his protection.

There is substantial evidence T.K.'s father physically abused him on multiple occasions.  On March 2, T.K. told two reporting parties, social worker T. Nguyen, and officer Bishop that his father had inflicted the bruises on his knees, back, and shoulders.  He also told T. Nguyen and Bishop that his father frequently hit him with a belt, stick, or his hand and made him run for long periods of time.  On March 5, he told the CAST interviewer that his father had punched him in his back and shoulders.  And he repeated that his father hit him with a belt, stick, or phone and made him run the course "'all day.'"  Then, on the March 26, he specified to Edwards that the bruises on his back were not from ice skating but from his father, and he repeated that his father had previously hit him with a phone, belt, and stick.  Likewise, T.K.'s paternal grandmother professed to have seen the father physically abuse T.K. and was concerned for T.K.'s safety.

Though T.K.'s father accused the police, reporters, social workers, and the paternal grandmother of lying, the court appeared to find their reports credible.  In contrast, it found the parents' testimony lacked credibility.  We do not question these findings on review.  (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299-1300.)  Besides, the parents' claims that the bruises on T.K.'s shoulders and back were caused by ice skating or T.K.'s classmates are unsupported by the weight of the record.  T.K. repeatedly said his father caused these bruises. Dr. Greco concluded the bruises were not the result of accidental trauma and only "a much older child could have caused the

bruising." Likewise, T. Nguyen noted on March 2 that some of the bruises appeared to be "the marks of the knuckles when a person is hit with a closed fist."

Similarly, the father's contention that he has never physically abused T.K. is controverted by his own statements. He initially admitted to officer Bishop that he pushed T.K. to the ground and that he used a belt to discipline T.K. He also told Bishop that he was only "'pretty sure'" he had not punched T.K. in the back. And during the hearing, he testified that hitting a child's buttocks with such force as to cause marks was not abuse, that using the belt as a scare tactic was appropriate, and that forcing a six-year-old child to run for two hours was proper discipline.

Moreover, while there is consistency to the accounts of the various reporters of abuse, social workers, and officer Bishop, the statements made by T.K.'s parents contain several inconsistencies. For example, the father initially admitted to Bishop that he hit T.K. with a belt, leaving three marks on his buttocks, and that he pushed T.K. to the ground because he was trying to avoid the belt. Then, at the hearing, he claimed he had not caused any marks and denied pushing T.K. to the ground. The father also initially told Bishop that when he asked T.K. about the bruises, T.K. "told [his father] that he pushed him and punched him on the back." At the hearing, the father testified that T.K. was silent when asked about the bruises. The father also initially confessed to Bishop that he made T.K. run for up to four hours as punishment. He then contended at the hearing that T.K. only ran for up to two hours. His testimony also conflicts with the mother's account. She first claimed during an interview that T.K. only ran for up to 45 minutes. Then at the hearing, she testified he only ran for up to 15 minutes.

Finally, it is concerning that T.K.'s father has failed to take any responsibility for his actions. Despite the considerable evidence against him, which include his own prior statements, at the hearing he refused to acknowledge any wrongdoing and accused everyone else of lying. It is equally troubling that T.K.'s

14

family, including his mother and maternal grandmother, appear to be pressuring T.K. to cover up his father's abuse.  T.K. cannot be returned home safely until his father is able to demonstrate an understanding of the line between discipline and abuse and the other family members are willing to hold him accountable for crossing that line.  Since T.K.'s parents cannot yet recognize that line, there exists a substantial risk that T.K. will be harmed if he is returned to their custody.  Increased visits from SSA will not materially reduce this risk.


III

DISPOSITION

The juvenile court's order is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.


15