Filed 2/28/17 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOANNE WILLIAMSON, as Successor Trustee, etc., | 2d Civil No. B265745 (Super. Ct. No. 1457582) (Santa Barbara County) |
| Plaintiff and Appellant, | |
| v. | ORDER MODIFYING OPINION AND DENYING NON-PARTY'S MOTION FOR MODIFICATION [NO CHANGE IN JUDGMENT] |
| THOMAS BROOKS et al., | |
| Defendants and Respondents. | |

THE COURT:

The court, on its own motion, orders that the opinion filed on January 31, 2017 be modified as follows:

1. Delete the first paragraph on page 1 in its entirety and replace it with the following paragraph: "The beneficiary of a trust asserts the trustees neglected to distribute trust assets to her. She claims as damages her inability to use those assets to prevent the loss of her home. We conclude the beneficiary suffered no compensable loss as a result of the trustees' alleged neglect."

2. The first sentence beginning with the word "Furthermore" and ending with the word "beneficiaries" of the second paragraph on page 9 is deleted and replaced with the following sentence: "Furthermore, most breaches of trust harm the trust itself and thus, to the extent that such breaches result in monetary liability for the trustee, they would result in liability to the trust and not the beneficiaries."

3. On page 10, of the first full paragraph, first sentence, the phrase beginning with the word "Although" and ending with the word "point," is deleted.

There is no change in the judgment.

The motion to modify the opinion filed by non-party Matthew P. Matiasevich is denied.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOANNE WILLIAMSON, as Successor Trustee, etc., | 2d Civil No. B265745 (Super. Ct. No. 1457582) (Santa Barbara County) |
| Plaintiff and Appellant, | |
| v. | |
| THOMAS BROOKS et al., | |
| Defendants and Respondents. | |

The beneficiary of a trust seeks the value of "opportunities lost" resulting from the trustees' refusal or neglect to distribute trust assets to the beneficiary.  Here we conclude that such conduct is not actionable.  There is a difference between such a claim and an actionable claim for losses to the trust resulting from the trustees' breach of fiduciary duty.

William Morgan (William) created an irrevocable subtrust for the benefit of his daughter, Beverly Morgan (Beverly).[1]  At its creation, the subtrust had an equity value of

---

[1] We refer to the Morgan family by their first names to avoid confusion.  No disrespect is intended.

$67,500. Over the next four years, the cotrustees, Barton E. Clemens, Jr., and Thomas Brooks, increased the subtrust's equity value to over $725,000. Claiming that she did not receive timely notice of the subtrust, Beverly caused the successor trustee, Joanne Williamson, to sue Clemens, Brooks, Connie Morgan (Connie) and William (collectively "respondents") for damages. Williamson alleges that if Beverly had been made aware of the subtrust, she would have used its assets to prevent the loss of her home.

Following a four-day trial, the trial court entered judgment in favor of respondents. It found that Clemens and Brooks did not breach their fiduciary duties and that neither the subtrust nor Beverly suffered any harm as a result of respondents' actions. We affirm.

FACTS AND PROCEDURAL BACKGROUND

William founded Kirby Morgan Dive Systems, Inc. (KMDSI), a successful business which designs and manufactures commercial-grade diving helmets. KMDSI is a closely held company with 200 shares of stock. Before creating his estate plan, William owned 155 shares. His daughter Connie owned the remaining 45 shares.

In December 2008, William established the Morgan 2008 Irrevocable Trust (Trust), which contains five separate subtrusts benefiting five of his adult children, including Beverly. William selected Brooks, his accountant, and Clemens, his attorney, to serve as cotrustees. The purpose of Beverly's subtrust was to allow William to transfer 18 shares of KMDSI stock to Beverly in a tax-advantaged manner. William accomplished this by funding her subtrust with a gift of $67,500. The cotrustees then purchased the 18 shares of KMDSI stock for

2

$675,000 by using the $67,500 cash as a down payment and issuing a promissory note to William for the remaining $607,500 of the purchase price. The cotrustees secured their obligations under the note by pledging the 18 shares of stock. Monetary distributions authorized by KMDSI's board were used to pay the income taxes due on the stock and also to pay down the promissory note, thereby increasing the equity value of the subtrust. The subtrust allowed Beverly to withdraw certain portions of the principal at 40, 50 and 60 years of age.

After the Trust was created, William, Brooks and Clemens discussed the need to inform William's children about the Trust. William said he wanted to tell them himself and it was agreed he would do so. William wished "to caution [the children] that it was not for purchases [for which] it wasn't intended." William informed Beverly about her subtrust on at least two occasions. The first was in an email dated March 22, 2009, in which William responded to an inquiry from Beverly regarding whether Brooks should file her 2008 taxes. William advised: "Tom Brooks and Bart Clemens set up Trusts that do not require you to change any of your tax stuff. File with anyone you like and the Trust Income has no effect on your taxes since each Trust is a separate entity and is taxed on its own. I pay the tax on the Trust. I need to sit with you sometime this year to explain it all." The second occasion occurred in late spring of 2009 on the beach at Hollister Ranch in Santa Barbara. William again informed Beverly of her subtrust and told her she would be taken care of in the event of his death.

Beverly was on the payroll at KMDSI until 2010, when William fired her for refusing to perform any work. William subsequently became concerned that if she gained an

3

ownership interest in KMDSI, she would harm the company. To ameliorate that concern, William exercised his right under the subtrust to substitute assets of equal value in place of the 18 shares of KMDSI stock. Effective November 1, 2012, William reacquired the 18 shares by substituting a promissory note in the amount of $799,000, representing the value of the shares. The note, as amended, requires William to pay Beverly's subtrust $6,258.01 per month through November 2022, followed by a balloon payment of $133,919.28 in December 2022.

After William fired Beverly from KMDSI, she was unable to make the $2,800 total monthly payments on her home at 1419 Via Rosa in Santa Maria (the "Via Rosa Property"). William and Connie had helped her purchase the home several years earlier. KMDSI gave her a $50,000 bonus to serve as a down payment. Connie paid the remainder of the down payment, and Connie and Beverly took out a $312,000 mortgage loan. Connie already had a home and did not reside at the Via Rosa Property. Her only goal was to help her sister buy a house.

Beverly told Connie she could pay approximately half of the monthly mortgage payments, but could not pay the rest. Connie offered Beverly three alternatives: (1) Connie could loan Beverly the other half of the monthly payments, but Beverly would be obligated to repay the loan; (2) Connie could quitclaim her interest in the Via Rosa Property to Beverly and Beverly could then do whatever she wanted with the property; or (3) Beverly could quitclaim her interest in the property to Connie, after which Connie would rent it to Beverly for $1,000 per month.

Beverly did not want to accept the loan from Connie because it did not make economic sense. At that time, the Via Rosa Property was worth approximately $100,000 less than the

4

outstanding mortgage. After discussing the matter with William and Connie, Beverly elected to quitclaim her interest in the property to Connie. Although Beverly was still obligated to the lender, Connie made the monthly payments and William assured her he would deal with any "underwater" issues. At that point, Clemens prepared a simple quitclaim deed to effectuate the transfer.

Instead of renting the Via Rosa Property from Connie for $1,000 per month, Beverly chose to move into Williamson's guest room at Hollister Ranch. Beverly testified that her dream was to live at Hollister Ranch and that her dream came true when she moved in with Williamson.

Connie continued to make the payments on the Via Rosa Property until she sold it in August 2012 for $226,495. The remaining mortgage was approximately $48,000 higher than the sales price. To close the transaction, William contributed over $61,000 to cover this difference as well as the closing costs.

In 2012, Beverly contacted Brooks for the first time to discuss the subtrust. Brooks promptly responded, providing the information and documents requested. When Beverly made a request to withdraw assets from the subtrust in September 2012, "Brooks worked with her to begin making monthly distributions."

After Clemens and Brooks resigned as cotrustees, M. Jude Egan, the successor trustee, filed a first amended petition against respondents for damages suffered as a result of Beverly's loss of the Via Rosa Property. The petition alleged claims for (1) formal accounting, (2) to compel delivery of trust assets, (3) breach of trust (fiduciary duty), (4) fraudulent transfer, (5) conversion, and (6) common count. Egan averred, among other things, that Clemens and Brooks breached their fiduciary

5

duties to Beverly by failing to inform her of the subtrust and by failing to supervise William's conduct. He also alleged that Clemens improperly delegated the trust administration to Brooks. Before trial, Williamson was substituted in as petitioner in her capacity as the second successor trustee.

The trial court rejected each of Williamson's claims. It determined that Beverly was aware of the subtrust and that, to the extent she lacked specific information about the subtrust, "it was [Beverly's] lack of due diligence and not the failure of fiduciary duty responsibilities by Clemens or Brooks." The court further found that there were no damages to the subtrust and that "there are no compensable damages of any kind related to the [Via Rosa Property]." It awarded respondents their attorney fees and costs of over $500,000. Williamson appeals.

DISCUSSION

*A. Standard of Review*

The parties dispute the applicable standard of review. Williamson contends a de novo standard applies: that this court should review as a question of law the trial court's application of law to undisputed facts. Respondents contend Williamson's challenge is governed by the substantial evidence standard of review, as the trial court made findings of fact on conflicting evidence.

The trial court's statement of decision contains both findings of fact and conclusions of law. We review the court's findings of fact for substantial evidence. (*People v. Mickey* (1991) 54 Cal.3d 612, 649; *Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558 (*Westfour*).) Under that standard, our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or

6

uncontradicted, to support the findings below.  (*Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892, 916; see *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.)  In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all conflicts in their favor.  (*Crawford*, at p. 429.)  "[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it."  (*Morgan*, at p. 916; *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

Where the trial court used findings of fact in drawing conclusions of law, we independently review the conclusions of law.  (*Westfour*, *supra*, 3 Cal.App.4th at p. 1558; *M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1519.)

### B.  Claim for Breach of Fiduciary Duty

"The elements of a cause of action for breach of fiduciary duty are:  (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach."  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086; *Knox v. Dean* (2012) 205 Cal.App.4th 417, 432.)  Williamson asserts that Clemens and Brooks breached their fiduciary duties to Beverly and that the breach resulted in damages.  We disagree on both counts.

### 1.  Lack of Damages

Probate Code section 16060 provides that "[t]he trustee has a duty to keep the beneficiaries of the trust reasonably informed of the trust and its administration."  Williamson asserts that if Clemens and Brooks had not abdicated

that particular duty to William, Beverly would have been aware of her rights under the subtrust and would have withdrawn money from the subtrust to maintain her ownership interest in the Via Rosa Property. The trial court found, however, that even assuming there was a breach of fiduciary duty, Beverly would not have elected to maintain that ownership interest. The court explained: *"Beverly intentionally elected to sell the house. There was no intimidation. She believed the house was toxic.* Her protestations at trial to the contrary were not persuasive. She was given reasonable options by which she could have stayed an owner, but decided she no longer wanted to live there or own the house. Moreover, even assuming for the sake of argument that she did not 'know' of the terms of her trust, the Court finds she would not have elected to stay. Even now she would only keep the house 'as an investment.' At the time they owed far more for the house than it was worth; the house was underwater and she knew it. The fact is, she wanted to live at Hollister Ranch. Thus, there are no compensable damages of any kind related to the house."

Substantial evidence supports the trial court's findings. William and Connie both testified that Beverly said she did not want to live at the Via Rosa Property because it was underwater, because she believed it was toxic, and because she had always wanted to live at Hollister Ranch. They also testified that Beverly chose to leave the Via Rosa Property after she quitclaimed it to Connie, even though she could have stayed there for only $1,000 per month, which was less than the $1,062.67 she said she could afford.

Beverly herself testified to these same facts. She admitted that she had concerns about the toxicity of the Via Rosa

8

Property and that it was her dream to live at Hollister Ranch. She stated that even if she had an opportunity to take back the Via Rosa Property, she would maintain it as an investment rather than move from Hollister Ranch. This evidence supports the trial court's findings that "she would have quitclaimed her interest in the Via Rosa [Property] even if she thoroughly understood all the assets available from her trust," and that "it may be that she is better off not having an interest in the house, at least in the short term, especially since she would only rent it out and is satisfied with living at the Ranch. I cannot quantify any damages for her, even if she were to prevail on liability."

Beverly's reliance on the Nebraska Supreme Court's decision in *Karpf v. Karpf* (Neb. 1992) 481 N.W.2d 891 is not persuasive. The court in that case did conclude that the trustees had violated a Nebraska statute requiring that the trustees inform the current beneficiaries in writing of the trust. But, as in this case, the court found a lack of damages because there was no evidence that the beneficiary would have exercised her withdrawal rights even if she had known of them. (*Id.* at p. 897.)

Furthermore, trustees accused of breaches of fiduciary duty may only be held liable for losses to the trust itself, not for personal damages to beneficiaries. "There must be a causal connection supporting any monetary award that the trustee is ordered to pay. [Citation.] Thus, the trustee is only liable for *loss or depreciation* resulting from the breach of trust, for profits that the trustee made through the breach of trust, *or for any profits that would have accrued to the trust* but for the breach of trust. Prob. C § 16440 (a)." (2 Cal. Trust and Probate Litigation (Cont.Ed.Bar 2016) § 21.65, p. 21-38, italics added.)

Although there appears to be no California case directly on point, *In re Eiteljorg* (Ind. Ct.App. 2011) 951 N.E.2d 565 is instructive. In that case, the Indiana Court of Appeals discussed whether a beneficiary may recover the value of opportunities lost when a trustee refuses or neglects to distribute assets from the trust. (*Id.* at pp. 571-574.) The court answered "no," based on Indiana Code section 30-4-3-11(b), which mirrors Probate Code section 16440 and, like Probate Code section 16440, is premised on the Restatement Second of Trusts, section 205 (1959). (*Eiteljorg*, at pp. 571-574.) The court explained: "The . . . commentary [to section 205(c) of the Restatement] clarifies that the lost profits contemplated by Restatement section 205(c) and corresponding Indiana Code section 30-4-3-11(b)(3) are those profits lost to the trust corpus due to a trustee's misuse of or failure to acquire trust property. Sections 205(c) and 30-4-3-11(b)(3) are not addressed to the scenario where, as here, a trustee has withheld trust property from a beneficiary, and we do not read these provisions to allow compensation for individual profits that beneficiaries allegedly would have generated on their personal shares but for a trustee's failure to timely distribute." (*Id.* at p. 572; see also *Estate of Kampen* (2011) 201 Cal.App.4th 971, 991-993 [holding that lost opportunity damages are not available as a remedy against a personal representative who had failed to timely distribute estate assets].)

Thus, we agree with the trial court that, even if a breach of fiduciary duty did occur, Beverly suffered no compensable loss with respect to the Via Rosa Property. Beverly also failed to prove that the cotrustees' actions resulted in damage to the subtrust itself. To the contrary, the equity value of the subtrust increased from $67,500 to over $725,000 during

10

the time of the cotrustees' management.  The court found that the use of KMDSI distributions to pay down the principal due on the promissory note given by the cotrustees "was reasonable, avoided significant risks to the trusts' assets, minimized interest expenses, and resulted in the best net financial benefit for the trusts."[2]  In the absence of any damage, Beverly has not established her claim for breach of fiduciary duty.

## 2. *No Breach of Fiduciary Duties*

Although it is not necessary to our decision, we conclude the record also supports the trial court's conclusion that the cotrustees did not breach their fiduciary duties to Beverly. Williamson emphasizes the testimony of Kenneth Moes, an attorney who testified that Clemens and Brooks breached their fiduciary duties to keep Beverly reasonably informed of the subtrust and its contents.  The trial court found Moes to be a credible witness, but did not find the testimony "to be preponderating in light of the facts of the case . . . ."

Moes opined that Clemens and Brooks breached their fiduciary duties by failing to inform Beverly about her subtrust. The trial court found, however, that "*Beverly was informed of her trust*[] *shortly after it was created*."  William told Beverly about the subtrust in an email and also told her about again in late spring 2009 during a walk on the beach at Hollister Ranch.

---

[2] William testified that if the co-trustees had held money in the subtrust for disbursement to Beverly, instead of making principal payments on the promissory note, the KMDSI board would have ceased making distributions to the subtrust.  In that event, the co-trustees would have defaulted on the promissory note, which required the payment of interest, and William would have foreclosed on the note, taking back the 18 shares of stock and leaving no money in the subtrust.

Beverly knew that Clemens and Brooks had set up the subtrust and were the cotrustees. Clemens testified that he confirmed with William that he had informed Beverly of the subtrust.

Williamson maintains that William was required to tell Beverly every detail of her subtrust. We disagree. Beverly was entitled to be informed about her subtrust so that she could take action to gain more information. As stated in Williamson's opening brief, "The most basic action required of a trustee under the duty to inform is to promptly inform the beneficiary of the existence of the trust and their status as beneficiaries, so that the beneficiary may exercise their rights to secure information about the trust." The cotrustees fulfilled this duty by ensuring that William informed Beverly of the subtrust, and when Beverly eventually asked Brooks for information regarding the subtrust, he promptly provided it. The trial court found that it was Beverly's "lack of due diligence" that prevented her from learning the details earlier. The court stated: "I think [Beverly] had real opportunities to inquire about her trust and what income or assets it had. No one appeared to have been hiding the facts from her. She appears to be a very bright and articulate person and the fact that she did not investigate or explore her options [is] inexplicable; that militates against her position."

Williamson cites no California authority suggesting that a trustee may be held liable for breach of trust or fiduciary duties under the factual scenario presented here. The trial court found that Beverly was made aware of the subtrust shortly after it was created. She understood that Brooks and Clemens were the cotrustees and she had ample opportunity to obtain more information about the subtrust while she was negotiating with Connie and William over the fate of the Via Rosa Property. That

12

she failed to do so does not make Clemens and Brooks liable for breach of fiduciary duty.  The trial court "accepted Brooks' and Clemens' explanation of why they did not communicate directly with Beverly about their appointment as cotrustees; their testimony was buttressed by William's testimony."  It also accepted their explanation regarding the management of the subtrust.  The court properly concluded "[t]he facts do not trigger liability under the Probate Code or in a court of equity."

DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION.



PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.


13

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Snyder Law, Barry Clifford Snyder and Joseph R. Billings, for Plaintiff and Appellant.

Seed Mackall, Peter A. Umoff and Alan D. Condren, for Defendants and Respondents Barton E. Clemens, Jr., William Morgan and Connie Morgan.

Mullen & Henzell and Jana S. Johnston, for Defendant and Respondent Thomas Brooks.