Filed 5/24/21 McClatchy v. Pruitt CA1/5

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| CARLOS MCCLATCHY,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>GARY PRUITT, et al.,<br><br>        Defendants and Respondents. | A160367<br><br>(San Francisco City and County<br>Super. Ct. No. PTR-11-294985)<br><br>**ORDER DENYING PETITION<br>FOR REHEARING AND<br>REQUEST FOR PUBLICATION;<br>MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellant's petition for rehearing and his request for publication are DENIED. It is further ordered that the opinion filed on May 4, 2021, shall be MODIFIED as follows:

1.      On page 7, in the first sentence of the first full paragraph, add the word "The" at the beginning of the sentence so that it reads "The Trustees answered . . . ."

2.      On page 7, at the end of the first paragraph under section E, remove the extra space before the period so that the sentence ends ". . . purported breach caused damage."

3.      On page 14, in the first sentence of subsection B.4. of the Discussion, delete "remaindermen" and replace with "remainder beneficiaries.

4.      On page 15, in the first sentence of the final paragraph of subsection B.4. of the Discussion, delete "remaindermen" and replace with "remainder beneficiaries."

1

5.      On page 19, in the second sentence of the second paragraph on the page, delete "remainderman" and replace with "remainder beneficiaries."

The modification effects no change in the judgment.

Date:    May 24, 2021           SIMONS, J.      Acting P.J.

Filed 5/4/21  McClatchy v. Pruitt CA1/5 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CARLOS MCCLATCHY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>GARY PRUITT et al., as Trustees, etc.,<br><br>        Defendants and Respondents. | A160367<br><br>(San Francisco City and County Super. Ct. No. PTR-11-294985) |

Carlos McClatchy, an income beneficiary of an irrevocable trust holding stock of the McClatchy Company, filed a petition asserting, among other things, that certain current and former trustees breached their fiduciary duties by failing to diversify the trust's assets.  After a 21-day bench trial, the probate court entered judgment in favor of respondents.[1]  Carlos appeals from the judgment and a postjudgment costs award entered in Trustees' favor.  We affirm.

_____

[1] Respondents (collectively, Trustees) in this appeal are Gary Pruitt, William Briggs McClatchy, Leroy Barnes, Theodore Mitchell, Kevin McClatchy, and Phillip Shatz as executor of the estate of William Ellery McClatchy.  For clarity, we will refer to the members of the

1

A.

In 1857, James McClatchy bought the paper that would become the Sacramento Bee, which led to the formation of a privately held and family-owned California corporation, McClatchy Newspapers. James declared the McClatchy Newspapers' mission to operate independent newspapers and uphold high journalistic standards. Leadership of McClatchy Newspapers eventually passed to his granddaughter, Eleanor McClatchy. During her long tenure, McClatchy Newspapers acquired several additional California newspapers, as well as television and radio stations.

In 1974, Eleanor created five irrevocable trusts, including the one at issue in this case: the Trust for the Primary Benefit of James B. McClatchy (the Trust). The Trust was funded with Eleanor's McClatchy Newspapers stock, some of which was gifted by Eleanor to the Trust and some of which was purchased by the Trust, pursuant to a loan from Bank of America.

Under the Trust's terms, the trustees were required to direct income, during the first few years, to paying off the loan. When no debt remained outstanding, the trustees were directed to "pay the entire net income of the trust estate" at least quarterly to Carlos's father (James B. McClatchy) or, if James was not then living, to Carlos and his brother William (in equal shares). The remainder was to eventually pass to the next generation of the McClatchy family, including

_____

McClatchy family by their first names or, in William Ellery McClatchy's case, by Ellery.

2

William's children, on the final death of Eleanor's relatives then living (in 1974).

The Trust, among other things, confers on individual trustees the express power to sell Trust property, to "invest and reinvest . . . in every kind of property," to borrow money, to defend litigation (at Trust expense), to vote any shares held by the Trust, to employ advisers to assist in trust administration, and to pay the Trust's expenses from income.

The Trust also contains special provisions, included at Eleanor's direction, that give the trustees unusually broad authority. Trustees have the power "[t]o continue to hold any securities . . . and to operate at the risk of the trust estate any business . . . as long as trustees, in their *absolute discretion*, may deem advisable, *without any obligation to diversify* trust investments or *eliminate any conflict* between the personal interests of any trustee and the interests of the trust beneficiaries." (Italics added.)

The Trust instrument states that on Eleanor's death, her nephew Charles K. McClatchy (known as C.K.)—who was employed by McClatchy Newspapers and would ultimately succeed her as its chief executive officer—was to serve as sole trustee. The Trust also provided, "It is trustor's wish that said trustee . . . , where practicable, appoint as such additional or successor trustees issue of [Eleanor]'s father . . . who has shown interest and ability in the field of communications and who said nephew believes *will manage the trust estate in such manner as to continue the McClatchy tradition of leadership in this field*." (Italics added.)

**B.**

After Eleanor's death in 1980, McClatchy Newspapers grew and excelled financially, using a strategy of acquiring underperforming journalism assets in growing markets. Between 1974 and 2007, dividends increased 50-fold.

In 1988, McClatchy Newspapers, Inc. became a publicly traded company and, at the same time, created a two-tier stock system to ensure continued family control. The shares held by the Trust were exchanged for Class B stock, which could only be owned by McClatchy family members and trusts for their benefit. Class B stock carried the right to elect 75 percent of the board of directors and had 10-to-1 voting superiority over the Class A shares, which were offered to the public.

At the time of the initial public offering, McClatchy family shareholders and the Trusts executed a stockholders' agreement, which imposed barriers on the sale of Class B stock—furthering the goal of preserving family control.

A year after the public offering, Eleanor's nephew, C.K., died. He was succeeded in his role as trustee by five directors of McClatchy Newspapers, including Carlos's father, James, and Ellery. At the time, James was the income beneficiary of the Trust and Ellery was an income beneficiary of another of the five trusts Eleanor created.

In 1998, McClatchy Newspapers, Inc. merged with the Cowles Media Company, which operated the Minneapolis Star Tribune. The Trust's Class B stock in McClatchy Newspapers was converted into newly issued Class B stock in the surviving entity, The McClatchy Company (Company). The Class B stock retained the same

supermajority voting rights and the right to elect three-quarters of the Company's Board.

In 2006, the Company acquired media giant Knight Ridder. The acquisition increased the Company's debt. The four trustees at the time, Pruitt, James, Ellery, and attorney William Coblentz, voted the Trust shares in favor of the acquisition. At the time, Pruitt was both a trustee and the Company's chief executive officer. Both James, who remained the Trust's sole income beneficiary and had been privy to all the due diligence, and Ellery supported the deal. James died a few months later.

## C.

Shortly after the Knight Ridder acquisition, the country entered a recession. The newspaper industry was hit particularly hard, as advertising migrated online. The Company's stock lost much of its value, as did other newspaper stocks across the country.

In 2008, as the recession continued to hurt the newspaper industry and the broader economy, the Company halved and then, in 2009, suspended its stock dividend payments as a debt restructuring concession to lenders.

The trustees at the time, Pruitt, Mitchell, William (who was himself an income beneficiary), and Barnes, considered, but rejected, the idea of selling Company stock to create income for the Trust. Between 2008 and 2011, the trustees also held annual meetings with non-director family members, including Carlos—who, along with William, was now an income beneficiary of the Trust. Neither Carlos nor any other McClatchy family member advocated selling any of the Company stock held by Eleanor's trusts.

5

At the time of trial, the Company's shares had lost much of their value, but it had survived, and it remained controlled by the McClatchy family.

**D.**

In 2012, Carlos filed a "Petition for Relief from Breach of Trust," under Probate Code section 17200, subdivision (a),[2] seeking damages for alleged mismanagement of the Trust's assets. Carlos later filed an amended petition and complaint, which is the operative pleading. It names the Company and certain current and former trustees, including Pruitt, William, Barnes, Mitchell, and Kevin, as defendants.

Carlos alleges he and the Trust have been damaged by the Trustees' and Company's wrongdoing. He alleges that the Trust's sole asset (Company stock) lost 90 percent of its value between March 2005 and June 2014 and that he has received no income since April 2009, when dividends were suspended. He asserts the Trustees, who were also Company directors, served the Company's interests rather than the beneficiaries' and breached multiple fiduciary duties, including the duty of prudent investment (§§ 16045, 16047, subd. (a)); the duty to treat beneficiaries impartially (§ 16003); the duty to keep beneficiaries reasonably informed (§ 16060); and the duty to investigate (§ 16403).

Carlos also alleges that the Company aided and abetted the Trustees' breaches of duty and (along with Barnes, Mitchell, Pruitt, and Coblentz's law firm) committed fraud by making misrepresentations regarding the 1987 stockholders' agreement and by concealing indemnification agreements extended by the Company to

---

[2] Undesignated statutory references are to the Probate Code.

6

the Trustees in 2005.[3]  In addition to surcharges and compensatory damages, Carlos seeks declaratory relief regarding the legal effect of the 1987 stockholders' agreement, disgorgement of profits, and punitive damages.

Trustees answered and later filed a petition to construe the Trust, which sought confirmation that it was Eleanor's intent to retain the stock held by the Trust.  The probate court bifurcated trial, with an initial bench trial on the equitable claims and a jury trial to follow on Carlos's legal claims (for fraud).

**E.**

In its statement of decision resolving the equitable claims after trial, the probate court determined that the "paramount" purpose of the Trust was to retain, to the extent possible, Eleanor's stock and to ensure continuing family control of the journalism enterprise.  The goal of income generation was "secondary at best."  The court also explicitly found, in relevant part, that the interests of the Company and the Trusts were aligned, that the Trustees had been faithful to the settlor's intent, acted in good faith, and had not breached their fiduciary duties.  Further, even assuming Carlos had proved a breach of duty, the probate court found that the Trustees were relieved of any liability for not selling the stock because they acted in good faith and that Carlos failed to prove that any purported breach caused damage .

After Carlos filed a premature appeal, the court granted the Company's and the Trustees' motions for judgment on his remaining

---

[3] Carlos settled his claims against Coblentz and his firm.

7

fraud claim.  The probate court entered judgment against Carlos and ordered him to pay the Trustees' and Company's costs.

We consolidated Carlos's appeals from the judgment (A158527) and the costs order (A158810).  When the Company later filed a chapter 11 bankruptcy petition, the consolidated appeals were stayed.  (See 11 U.S.C. § 362.)  We then severed Carlos's appeal against the non-debtor Trustees and allowed that appeal to go forward under a separate appellate case number (A160367) while the original consolidated appeals remained stayed against the Company.[4]

---

[4] Carlos filed a combined motion to augment the record and request for judicial notice, on which we initially deferred ruling.  Carlos asks us to augment the record to include, or alternatively take judicial notice of, an annual report and a proxy statement that the Company filed with the Securities and Exchange Commission after trial.  We deny the motion and request for judicial notice.  The annual report and proxy statement in question were not before the probate court and, accordingly, are not part of the record.  (See *Deyoung v. Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 863 [reviewing court cannot augment record to include documents not filed or lodged below].)  We will not take judicial notice of the existence of these documents because Carlos does not show that they are relevant to any issue on appeal.  (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1; *Reserve Insurance Company v. Pisciotta* (1982) 30 Cal.3d 800, 813 ["when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered"].)

In his second request for judicial notice, Carlos asks us to take judicial notice of postjudgment filings in the Company's bankruptcy proceedings.  He asserts that it is now indisputable that "the [Company] Class B common stock that . . . [Trustees] held as the Trust's only investment has become worthless and, in fact, no longer exists."  The request is granted to the extent Carlos concedes his declaratory relief claim is now moot but is otherwise denied.  Carlos fails to demonstrate how the postjudgment proceedings are relevant to any other issue on appeal.  (See *Ketchum v. Moses, supra,* 24 Cal.4th at

8

## DISCUSSION

## A.

Seeking to invoke our independent review, Carlos claims to present only questions of law on appeal. Primarily, he contends the probate court erred in its construction of the trust instrument, which caused it to erroneously ignore certain fiduciary duties and to erroneously find no breach.

" 'The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach.' " (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1300.) "[T]he absence of any one of these elements is fatal to the cause of action." (*LaMonte v. Sanwa Bank California* (1996) 45 Cal.App.4th 509, 517.)

Carlos is correct that the interpretation of written instruments and the determination of existing duties generally present questions of law subject to de novo review. (*Burch v. George* (1994) 7 Cal.4th 246, 254; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1599, 1606.) However, we review the probate court's findings on factual questions—including whether a trustee breached any applicable fiduciary duty and whether any breach caused damage—for substantial evidence. (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*); *Penny v. Wilson* (2004) 123 Cal.App.4th 596, 603.)

Under the substantial evidence standard of review, "findings of fact are liberally construed to support the judgment and we consider

p. 1135, fn. 1; *Reserve Insurance Company v. Pisciotta, supra,* 30 Cal.3d at p. 813.)

9

the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson, supra,* 6 Cal.App.5th at p. 981.) As the appellant, Carlos has the burden of demonstrating the absence of substantial evidence to support the probate court's findings. (*Nichols v. Mitchell* (1948) 32 Cal.2d 598, 600.)

## B.

Carlos devotes a substantial portion of his 146-page brief to his argument that the probate court erred in concluding the Trustees did not breach their fiduciary duties by failing to diversify trust assets at various points before or after the Knight Ridder acquisition. Specifically, he contends the court erred by concluding the Trustees had an absolute duty to retain Company stock even if it meant losing almost the entire value of the Trust's assets. He misunderstands the probate court's decision.

## 1.

Unless the trust instrument provides otherwise (§ 16000), a trustee's fiduciary duties include the duty to manage trust assets prudently (§§ 16045, 16047, subd. (a)), the duty to diversify investments (§ 16048), the duty to preserve trust property (§ 16006), the duty to deal impartially with all beneficiaries (§ 16003; *Hearst v. Ganzi* (2005) 145 Cal.App.4th 1195, 1200, 1208), and the duty of loyalty (§ 16002, subd. (a)); *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 905). A trust instrument may relieve a trustee of fiduciary duties otherwise imposed by statute, but to do so the language must be "clear and unequivocal." (*Estate of Thompson* (1958) 50 Cal.2d 613, 615.)

Thus, the primary issue is not establishing the default rules but determining Eleanor's expressed intent and whether she intended to waive the default rules. (See *Estate of Bixby* (1961) 55 Cal.2d 819, 824; *Copley v. Copley* (1981) 126 Cal.App.3d 248, 270.) " 'What [s]he intended is to be gathered from a consideration of the whole instrument creating the trust, the nature and object of the trust and all other circumstances which have a bearing on the question.' " (*Morgan v. Superior Court* (2018) 23 Cal.App.5th 1026, 1039; accord, *Estate of Russell* (1968) 69 Cal.2d 200, 210 ["a court cannot determine whether the terms of the will are clear and definite in the first place until it considers the circumstances under which the will was made so that the judge may be placed in the position of the testator whose language he is interpreting"].)

**2.**

The probate court admitted uncontradicted extrinsic evidence— from both the attorney who provided tax analysis (James Canty) and the attorney who drafted the Trust (Donald McCubbin)—to determine if the Trust was ambiguous or reasonably susceptible to the parties' competing interpretations. (See *Estate of Duke* (2015) 61 Cal.4th 871, 879; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 811.)

McCubbin testified he was specifically directed to include the special provisions waiving trustee conflicts and granting trustees absolute discretion to hold stock at the risk of the trust estate with no obligation to diversify. According to McCubbin, these provisions were designed to fulfill Eleanor's intent that the trusts retain her stock and continue family control of its newspapers. The unique successor

11

trustee and conflict elimination provisions were included because Eleanor knew, and desired, that her successor trustees would be running the business.

Canty recalled Eleanor demanding a change to the trust instrument before she would sign. She had noticed that, in the draft successor trustee provisions, Bank of America could become sole trustee on her death, in the event she outlived her nominated successors, and thus could theoretically have the right to sell the Trust's stock. She disliked the idea so much that she insisted her trusts be revised to eliminate the possibility. Although Eleanor reluctantly accepted the legal requirement that someone have the power to sell, Canty explained that selling the stock "was an anathema to her. She did not want the Bank of America having any right to sell the stock whatsoever."

Canty's memorandum memorializing the meeting during which Eleanor amended and then signed the Trust states that "Miss McClatchy was somewhat taken aback when the power to sell the McClatchy stock was mentioned, indicating that she hoped that the trusts would not sell the stock and that the stock would remain in the McClatchy family." Canty's memorandum concludes: "At the end of the day [Eleanor] indicated that she was now greatly relieved that something had been done to the end of assuring that the newspaper remained in family control in the future." The probate court expressly found Canty and McCubbin's testimony to be "unbiased, highly credible and decisive."

Because there is no conflict in the extrinsic evidence presented to the probate court, we construe the Trust independently. (*Burch v. George, supra,* 7 Cal.4th at p. 254 [interpretation of trust presents a

12

question of law subject to independent review "unless interpretation turns on the credibility of extrinsic evidence or a conflict therein"]; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, supra*, 53 Cal.App.5th at pp. 819, 821.)  However, extrinsic evidence is not admissible to interpret a written instrument in a manner to which it is not reasonably susceptible.  (*Estate of Russell, supra,* 69 Cal.2d at pp. 211-212.)

**3.**

Carlos's reliance on default rules provided by the Restatement Third of Trusts does not convince us that the probate court erred in its construction of the Trust.  We agree with the probate court that Eleanor's "paramount intent was that the trusts retain her stock to the sixth McClatchy generation, thus perpetuating McClatchy family control of its newspapers.  Income beneficiaries were a secondary consideration at best."  Both the terms of the Trust itself, and the surrounding circumstances, make this interpretation plain.

Carlos relies on authority suggesting a trustee has a duty to sell (or file a petition seeking modification of a trust to provide authority for such a sale) when a trust's assets become unproductive or when securities subject to a retention clause have changed significantly due to a merger.  (See, e.g., *Adams v. Cook* (1940) 15 Cal.2d 352, 358-360; *Stanton v. Wells Fargo Bank & Union Trust Co*. (1957) 150 Cal.App.2d 763, 770.)  He insists the probate court erred by concluding the Trustees had *no* discretion to sell the Company stock.

We do not read the statement of decision as concluding the Trustees had no power to sell any Company stock, no matter the circumstances.  Rather, the probate court explicitly recognized that the

13

Trustees did have authority to sell Trust assets.  Nor did the probate court misconstrue the duties of prudent investment and preservation of trust property.

The problem for Carlos is that the Trust includes specially drafted provisions that grant the trustees the absolute discretion to hold stock, at the risk of the trust estate and with no obligation to diversify.  This language is wholly inconsistent with Carlos's position that the Trustees, by retaining Company stock, breached their duties to diversify and to avoid Trust losses as a matter of law.  Carlos's position also conflicts with McCubbin's undisputed testimony that these provisions were designed to fulfill Eleanor's intent that the trusts retain her stock and preserve family control of its newspapers.

The probate court correctly concluded Eleanor gave the trustees absolute discretion to retain "*any* securities", even if it meant a loss to the trust estate, with no duty to diversify.  (Italics added.)  (*Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1085.)  As explained in further detail *ante*, a grant of absolute discretion does not mean a trustee can do as they please, "but rather that the grantor has waived the requirement that the conduct of the trustee at all times satisfy the standard of judgment and care exercised by a reasonable, prudent man."  (*Coberly v. Superior Court of Los Angeles County* (1965) 231 Cal.App.2d 685, 689.)

**4.**

The probate court also correctly concluded that the Trust adjusted the duty of impartiality to favor the remaindermen.

In addition to the permissive retention clause, which authorizes a trustee to make long-term investment decisions that may benefit

14

remainder beneficiaries at the expense of income beneficiaries, there is no provision authorizing a trustee to invade principal to provide for an income beneficiary's support. And the Trust provides that *all* Trust expenses shall be paid exclusively from income. (Cf. §§ 16370-16371.) These provisions, read together, effectively mean that, at any time during the Trust's lengthy administration, the trustees could borrow and, even if the Company was paying dividends, deprive income beneficiaries of income. Indeed, the Trust explicitly provided that the initial income beneficiary (James) could be entirely deprived of income during the first 10 years of the Trust's existence, while the Bank of America loan was being repaid.

Favoring the remaindermen in this fashion furthered Eleanor's goal of retaining family control of the McClatchy business for as long as possible. The probate court's conclusion that this goal was primary is supported both by the terms of the Trust instrument itself and by Canty's testimony—he explained that McClatchy Newspapers was "the most important thing in [Eleanor's] life," that "keeping the company independent and in family control was what she was all about," that the company was "more important [to her] than people," and that Eleanor never mentioned the beneficiaries. The court did not err in concluding that Eleanor's intent to benefit the income beneficiaries was "secondary" and that the Trustees' exercise of discretion may only be reviewed for bad faith or other improper motives. (See *Hearst v. Ganzi, supra,* 145 Cal.App.4th at p. 1211.)

**5.**

Finally, Carlos has not shown that the probate court erred by concluding Eleanor relaxed the Trustees' duty of loyalty.

15

"The duty of loyalty, requiring a trustee to administer the trust solely in the interest of the beneficiaries (§ 16002, subd. (a)), is the most fundamental duty of a trustee." (*Uzyel v. Kadisha, supra*, 188 Cal.App.4th at p. 905.)  This duty is intended to protect against conflicts between a trustee's fiduciary duties and their personal interests, as well as to prevent a trustee from acting to benefit any third party.  (*O'Neal v. Stanislaus County Employees' Retirement Assn*. (2017) 8 Cal.App.5th 1184, 1209.)  However, the terms of the trust itself may permit what would otherwise be a violation of the duty of loyalty. (*Uzyel v. Kadisha, supra*, at p. 905; *Copley v. Copley, supra,* 126 Cal.App.3d at pp. 278-279.)

The Trust explicitly allows the Trustees "[t]o hold any securities . . .  and to operate at the risk of the trust estate any business . . . as long as trustees, in their absolute discretion, may deem advisable, *without any obligation to* diversify trust investments or *eliminate any conflict* between the personal interests of any trustee and the interests of the trust beneficiaries."  (Italics added.)  Eleanor also stated her desire that C.K. succeed her as sole trustee on her death and specified that any successor trustees appointed in the future be people with "interest and ability in the field of communications" who "will manage the trust estate in such manner as to continue the McClatchy tradition of leadership in this field." (107AA 37807; 82AA 33007-33008 [Art. IV.A., IV.D])  McCubbin testified these provisions were included because Eleanor knew, and desired, that her successor trustees would be running the McClatchy business.

It is impossible to square Carlos's interpretation of the Trust— that the Trustees breached their duties of loyalty by acting in dual

16

roles—even if there was never an actual conflict between the interests of the Company and those of its controlling shareholders —with these provisions clearly indicating that Eleanor understood and intended continued family control, that successor trustees would be involved in running the business, and that the Trustees had no obligation to eliminate conflicts.

Contrary to Carlos's position, the probate court's statement of decision " 'fairly disclose[d] the court's determination as to the ultimate facts and material issues. ' " (See *Thompson, supra*, 6 Cal.App.5th at p. 983.) The probate court delineated the key Trust provisions and made explicit findings—that there was no breach and no actual conflict between the Company and the McClatchy family. The Trustees cannot have committed a breach of the duty of loyalty by following Eleanor's explicit directions. (*Copley v. Copley, supra,* 126 Cal.App.3d at p. 279.)

Carlos has not demonstrated the probate court erred in its construction of the Trust.

## C.

Carlos has not met his burden to show the probate court's findings—that the Trustees acted in good faith to further the purposes of the Trust—are unsupported by substantial evidence.

## 1.

If exercised in good faith by a trustee, absolute discretion "cannot be controlled by a court on considerations going to the soundness of the discretion so exercised." (*Estate of Ferrall* (1953) 41 Cal.2d 166, 173; accord, § 16081, subd. (a) ["if a trust instrument confers 'absolute,' 'sole,' or 'uncontrolled' discretion on a trustee, the trustee shall act in accordance with fiduciary principles and shall not act in bad faith or in

disregard of the purposes of the trust"]; *Morgan v. Superior Court, supra,* 23 Cal.App.5th at p. 1035.)  In fact, the trustee is entitled to a presumption that they acted in good faith; the burden is on the beneficiary to show absolute discretion was exercised in bad faith. (*Estate of Nicholas, supra*, 177 Cal.App.3d at p. 1087; accord, *Estate of Ferrall, supra*, at p. 177.)  A similar standard governs Carlos's claims regarding breach of the duties of loyalty and impartiality.  (See *Hearst v. Ganzi, supra,* 145 Cal.App.4th at pp. 1208-1209, 1211; *Copley v. Copley, supra*, 126 Cal.App.3d at pp. 279-280; Rest.3d Trusts, § 78.)

**2.**

Again, we find no support for Carlos's argument that the probate court failed to fairly disclose its determination as to the ultimate facts. (*Thompson, supra,* 6 Cal.App.5th at p. 983.)  It is Carlos who fails to address the key issue—whether substantial evidence supports the probate court's explicit findings that, at the time it was made, the Trustees' decision to hold Company stock was made in good faith, was faithful to the Trust's purposes, and did not breach their fiduciary duties.  (See §§ 16081, subd. (a), 16040, subd. (b) ["The settlor may expand or restrict the standard [of care] . . . by express provisions in the trust instrument.  A trustee is not liable to a beneficiary for the trustee's good faith reliance on these express provisions."].)

An appellant seeking substantial evidence review on appeal must set forth all material evidence, with citations to the record, not merely the evidence favorable to his position.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881-882; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)  Carlos has failed to meet this burden.

18

In any event, Pruitt, Mitchell, Kevin, and Barnes provided testimony supporting the court's findings that they acted in good faith and consistent with the Trust's purposes. They testified that they considered converting and selling Trust stock but believed, despite the lower share price for class A stock, that selling irreplaceable B shares was not advisable. They relied on Eleanor's explicit statement in the Trust that they could hold stock and operate "at the risk of the Trust estate" and with no duty to diversify, which demonstrated her recognition "that there was inherent risk in concentration, and that it could be operated at risk of that."

They also relied on the general economic conditions; the fact that, before the instant litigation, no McClatchy family member (including Carlos) advocated selling; that the stock price had previously bounced back; and their belief that selling at a market low would be imprudent, especially if the Company would return to paying dividends. They also recognized the intrinsic value of the B shares (in maintaining family control of the Company) and of delivering those shares (and corresponding control) to the remainderman. Mitchell testified that, although the threat to family control would vary depending on the number of Class B shares converted and sold, "at almost any level [of shares sold]," increasing the number of Class A shares would increase the threat to family control and independence.

These were appropriate considerations. (See § 16047, subd. (c) [listing appropriate factors to be considered in managing trust assets, including "[g]eneral economic conditions" and "[a]n asset's special relationship or special value . . . to the purpose of the trust or to one or more of the beneficiaries"]; *Estate of Bixby, supra*, 55 Cal.2d at p. 825

19

[trustee reasonably exercised discretion by deciding to retain underperforming stock of closely held family corporation because settlor authorized retention and "the testator may well have intended that the Bixby Ranch Company stock be held for the benefit of the remaindermen"].)

The probate court found the Trustees "honest and capable people, not malefactors," and that they exercised their discretion in good faith. It is not our role to second guess its factual findings. Substantial evidence supports the probate court's good faith finding and its finding that the Trustees' decision to hold the stock did not contravene the Trust's purpose.

We need not address Carlos's additional contentions on breach of fiduciary duty. Even if we assume (for the sake of argument) he is correct that the Trustees breached existing duties to investigate or keep beneficiaries informed, he forfeits any substantial evidence challenge to the probate court's alternative finding that he failed to prove causation of damage. (*Schmidlin v. City of Palo Alto, supra*, 157 Cal.App.4th at p. 738 [" 'party who challenges the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient' "].) By failing to challenge the sufficiency of the evidence supporting these findings, Carlos forfeited his appellate challenge. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 [" 'one good reason is sufficient to sustain the order from which the appeal was taken' "].)

20

**D.**

Carlos maintains the probate court erred by granting Trustees' judgment on his fraud claim. We disagree.

**1.**

The elements of fraud are: (1) a misrepresentation—false representation, concealment, or nondisclosure; (2) knowledge of falsity; (3) intent to defraud—to induce reliance; (4) justifiable reliance; and (5) resulting damage. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.)

Carlos's fraud claims rely on statements made by Mitchell and Barnes regarding the stockholders' agreement, as well as Barnes's, Pruitt's, and Mitchell's alleged failure to disclose that the indemnification agreements extended to them in their role as trustees. Carlos alleges that, at meetings in December 2008 and March 2010, Mitchell and Barnes falsely represented that the 1987 stockholders' agreement prevented them from selling Company stock.

After the bench trial, the Company and Trustees filed separate motions for judgment or summary adjudication on Carlos's remaining fraud claim. Pruitt, Mitchell, and Barnes contended that Carlos could not prove any misrepresentation or concealment occurred and, further, the probate court's causation findings applied to Carlos's legal claims and thereby precluded his recovery.

The court granted the motion for judgment, agreeing that Carlos could not establish any concealment regarding the indemnification agreements because they were publicly announced, and Carlos had the opportunity to read the indemnification agreements in the Company's public filings. The court also found that Carlos could not prevail on his

fraud claims because his claim that Trustees breached the duty to keep beneficiaries informed (§ 16060) relied on the same facts, and the court's causation findings were fatal to both. (See *Raedeke v. Gibraltar Savings & Loan Ass'n.* (1974) 10 Cal.3d 665, 671 ["in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury"].)

**2.**

Carlos again forfeits any substantial evidence challenge to the probate court's causation findings. (See *Schmidlin v. City of Palo Alto, supra*, 157 Cal.App.4th at p. 738.)

Furthermore, substantial evidence supports the probate court's finding that the alleged fraud regarding the scope of the indemnification or stockholders' agreements was inconsequential. Carlos's theory is that if he had he known the "true facts," then he would have been able to pursue his rights against the Trustees sooner and "require" them to comply with their duties. There was no conflict between the Company's and Trust's interests. And Carlos could not require the Trustees to do anything other than act in good faith and in compliance with Eleanor's intent (as they did). Furthermore, Mitchell, Barnes, Kevin, and William testified the stockholders' agreement played no role in the decisions not to sell the Trust's Company stock.

Substantial evidence supports the probate court's finding that any assumed concealment or misrepresentation did not cause harm to Carlos or the Trust. (See *Williamson v. Brooks, supra*, 7 Cal.App.5th at p. 1301.)

22

Although he does not challenge the court's findings that any misrepresentation or concealment did not cause actual damage, Carlos insists we must reverse because he is entitled to punitive damages or investigative costs he incurred with respect to his (failed) fraud claim. We are unpersuaded. (See Civ. Code § 3294; *Mother Cobb's Chicken Turnovers v. Fox* (1937) 10 Cal.2d 203, 206 [punitive damages not recoverable unless actual injury suffered].)

**E.**

Finally, Carlos insists the probate court erred in ordering him to pay Trustees' costs rather than charging them against the Trust. He is wrong.

Carlos's personal liability for costs arises from section 1002. Section 1002 states, "Unless it is otherwise provided by this code or by rules adopted by the Judicial Council, either the superior court or the court on appeal may, in its discretion, order costs to be paid *by any party to the proceedings, or out of the assets of the estate*, as justice may require." (Italics added.) Thus, the probate court has discretion "to decide not only whether costs should be paid, but also, if they are awarded, who will pay and who recover them." (*Hollaway v. Edwards* (1998) 68 Cal.App.4th 94, 99, italics omitted.)

Probate courts also have equitable powers "to charge attorney *fees* and costs against a beneficiary's share of the trust if that beneficiary, *in bad faith*, brings an unfounded proceeding against the trust." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 183, italics added; accord, *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328, 1335.) However, such equitable powers do not support an award of fees and costs against a beneficiary personally. (*Pizarro, supra,* at pp. 187-189.)

23

Here, the probate court did not order Carlos to pay attorney fees or costs under its equitable powers. Section 1002 does not require a finding of bad faith to assess costs. The authority Carlos cites does not consider section 1002. (*Pizarro v. Reynoso, supra,* 10 Cal.App.5th 172; *Rudnick v. Rudnick, supra,* 179 Cal.App.4th 1328.) Carlos does not demonstrate the probate court abused its discretion.

## DISPOSITION

The judgment and postjudgment costs order are affirmed. The Trustees shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____

BURNS, J.

We concur:

_____

SIMONS, ACTING P.J.

_____

NEEDHAM, J.

A160367