Filed 7/3/25  Izadi v. Elite Business Investments CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KAMAL IZADI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ELITE BUSINESS INVESTMENTS CORP., et al., <br><br> Defendant and Respondent. | B330705 <br><br> (Los Angeles County <br> Super. Ct. Nos. 19STCV09664, <br> BC690974) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Wesley L. Hsu, Judge.  Affirmed.

Williams Iagmin and Jon R. Williams for Plaintiffs and Appellants.

Blank Rome, Gregory M. Bordo and Christopher J. Petersen for Defendants and Respondents Elite Business Investments Corp. and David Dang.

Dana M. Perlman for Defendants and Respondents Mahvash May Rahmanian and Scotty's Coin-Op Laundry, Inc.

Frandzel Robins Bloom & Csato, Andrew K. Alper and Hal D. Goldflam for Defendant and Respondent Eastern Funding LLC.

## INTRODUCTION

Appellants purchased a coin-operated laundry business and secured a loan to buy new equipment for it. When the business failed, the appellants filed suit against the seller, brokers, and lender, alleging that they had misrepresented the income generated by the laundry and breached their respective duties. The lender separately filed suit against appellants to recover the amount due on the loan. The cases were consolidated and tried to the court over a ten-day trial. The trial court found against appellants on their affirmative claims, as well as the lender's claims against them. On appeal, appellants challenge certain aspects of the trial court's ruling as to the brokers and the lender, alleging the trial court misapprehended the scope of the duties owed by those parties in the transactions. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Background Facts*[1]

This matter arises from the sale of Scotty's Coin Op Laundry Inc., a coin-operated laundry business. Mahvash May Rahmanian (Rahmanian) originally purchased the business in 2010. She operated the laundry for several years without keeping "books" for the business and depositing only a small percentage of the business's cash proceeds in a bank.[2]

In 2015, Rahmanian decided to sell the laundry and engaged David Dang (Dang) and Elite Business Investments Corp. (Elite) to act as brokers and list the business. Rahmanian orally provided Dang with the information

---

[1] These facts are largely taken from the portions of the trial court's statement of decision that no party has challenged on appeal.

[2] The business's tax returns for 2015 and 2016 reported less than $20,000 per month in gross income for the laundry.

used to prepare the listing sheet for the business, including a reported gross monthly income of $26,500. She also provided Dang with the utility bills for the laundry, which Dang used to perform a "water analysis" comparing the business's water usage to Rahmanian's claimed income. According to Dang, the business's water usage was approximately equivalent to Rahmanian's oral representations regarding the laundry's income. Using all of this information, Elite prepared a listing sheet offering the business for sale for $200,000.

When no offers were made to buy the laundry, Dang prepared an updated listing sheet, reducing the price to $150,000. This updated listing sheet contained the following disclaimer: "The above information has been provided to broker solely by the owner for the purpose of presenting said information to prospective buyers. Owner has represented to broker that such information is accurate [sic] and broker is relying upon such representation in providing the information to prospective buyers. Broker neither provides nor implies any guarantee regarding the accuracy or completeness of this information and prospective buyers should conduct their own investigations."

In August 2016, Kamal Izadi (Izadi) became aware of the laundry through his mother. Later that month, he met Rahmanian at her house to discuss the business, and she referred him to Dang and Elite. Izadi and Dang met at the laundry to discuss the potential sale. Dang gave Izadi the updated listing sheet. Izadi noted the poor condition of the laundry, including the fact that at least half of the machines were nonoperational, as well as issues with the front door and lighting. Dang said that with new equipment, the laundry presented a good potential investment.

Dang and Izadi met again a few days later.  Dang gave Izadi a dual agency disclosure form that authorized Dang and Elite to represent Izadi in the sale of the laundry.  Dang explained the form to Izadi, who signed it.  At the same time, Izadi executed a counteroffer to purchase the laundry for $50,000, which was contingent on his receipt of financing for new equipment.  Izadi's counteroffer also specified that "Seller and Buyer shall conduct a four (4) week income verification prior to the close of escrow."  During this second meeting, Dang mentioned the prospect of performing a "coin count" to verify the laundry's income, telling Izadi it was important and "good to do."  Dang and Izadi also discussed the purchase of new equipment for the laundry.

Dang transmitted Izadi's counteroffer to Rahmanian, who rejected it.  Rahmanian decided to make her own counteroffer with a purchase price of $65,000.  However, she told Dang that because she was offering such a low sale price, she wanted to sell the store "as is" with "no warranty of the business."  Rahmanian's counter stated, "The business is sold 'AS-IS' condition, NO WARRANTY of the business."  It also provided that "All other contingency will remain the same on the original offer."  Such "as-is" sales are apparently common in the coin-operated laundry business.

Dang brought Rahmanian's counteroffer to Izadi, explaining Rahmanian's stipulation that the store be sold in as-is condition with no warranty of the business.  Izadi had no response to the as-is condition but objected to a sale price of $65,000.  Izadi wanted to counter Rahmanian's counteroffer with $55,000, but Dang told him that amount was too low.  The two again discussed the possibility of conducting a coin count to verify the laundry's income, but Izadi decided against it and ultimately waived a coin count.

A few days later, Izadi instructed Dang to make a counteroffer of $60,000. Izadi accepted Rahmanian's proposal for an "as-is" sale because Izadi planned on remodeling the store anyway. The counter otherwise adopted the terms of Izadi's original $50,000 offer. Izadi signed this counteroffer on September 22, 2016, and Rahmanian accepted it the same day.

Izadi created KJI Investment Group, LLC (KJI) to purchase the laundry. Izadi was the sole member and owner of KJI.

At Izadi's request, the parties agreed to delay the opening of escrow. During this time, Dang provided Izadi with the laundry's utility bills.

In October 2016, Dang completed the "take sheet" for submission to the escrow company, New Century Escrow. New Century Escrow produced escrow instructions for the parties' review. In pertinent part, those instructions provided that: (1) the transaction would be an "as-is" sale;[3] (2) there would be no coin count or other verification of the laundry's income;[4] (3) Rahaman, Dang, and Elite did not make any representation, warranty, or

---

[3] "Seller does covenant and guarantee to the buyer that, as of the date Seller delivers and Buyer takes possession of the subject premises and assets, all equipment will be delivered in 'AS-IS' condition. Seller will not offer any repairs or warranty."

[4] "Buyer and Seller have agreed that there will be no coin count, no examinations or investigations of the value, income, expenses, personal property, fixtures or premises of the subject business. Buyer has agreed to and is purchasing the business in 'AS-IS' condition."

guaranty of the business's income;[5] and (4) Izadi was purchasing the business solely in reliance on his own inspections and examinations of the business.[6]

Dang and Izadi met to go over the escrow instructions. Dang went over each provision with Izadi, and Izadi initialed the instructions in Dang's presence, including on the pages containing the provisions discussed above. Izadi agreed to the terms of the escrow and chose to sign the instructions and proceed with the sale.

The next day, Dang prepared an order for new equipment for the business, which was necessary for the loan application. In addition to acting as a broker, Dang was a distributor for Continental brand laundry equipment, and the order he prepared for Izadi included Continental equipment. Izadi knew that Dang would benefit from the equipment sale. When Izadi got a competing bid for new equipment, Dang revised his proposed order, reducing the price on some equipment and substituting one model of machine. Izadi accepted Dang's revised order. The equipment in Dang's revised purchase order was not the same mix of equipment used to forecast the laundry's future earnings in KJI's loan application.

---

[5] "Neither seller nor the Broker . . . [have] made any written or oral representation, warranty or guaranty of the value, of any of the past, present, or future gross income, net income or expenses of condition of the property or assets of the business."

[6] "Buyer has conducted and prior to the close of escrow will conduct, such inspections, examinations and investigations of the value, income, expenses, personal property, fixtures and premises of the business as buyer deems necessary and appropriate, and Buyer has agreed to and is purchasing the business solely in reliance upon such inspections, examinations and investigations and buyer is not purchasing, and shall not purchase, the business in reliance upon [any] representation, warranty or guaranty whatsoever by Seller or Broker."

Dang completed the loan application for KJI to purchase the new equipment and forwarded it to Eastern Funding LLC (Eastern) along with KJI's supporting materials.[7] Eastern relied in part on Dang's updated listing sheet, but ultimately conducted its own utility analysis to estimate the laundry's income. Using the materials provided by KJI, Eastern determined the loan was risky. However, Eastern's internal projections indicated the laundry would be profitable and KJI would be able to repay the loan. Based on these projections and KJI's supporting documents, Eastern proposed terms to finance the purchase of new equipment. As one of its terms, Eastern required that Izadi personally guarantee the loan, as it did for all its loans. Izadi accepted Eastern's terms and executed the note and personal guaranty.

Escrow closed on December 22, 2016, and Izadi, through KJI, took over the laundry.[8] Izadi ran the business in a different manner than Rahmanian, and did not spend as much time at the laundry or personally connect with customers as Rahmanian had done. The business also faced increased competition as a brand-new coin-operated laundromat opened less than a mile away. Izadi's coin count records showed a gross income of approximately $25,000 per month from November 27, 2017, to March 5, 2018, and an average of approximately $26,000 per month from April 6, 2018, to May 11, 2018. However, the business ultimately did not perform as Izadi expected, and the laundry failed. Eastern sold the laundry's equipment at a loss.

---

[7] These materials included a credit application, a personal financial statement, bank statements, tax returns, and other documents.

[8] Before escrow closed, Izadi asked Dang to renegotiate the terms of the lease for the laundry. Dang never attempted to do so.

7

II.    *Lawsuit*

On January 22, 2018, Izadi and KJI (collectively, appellants) filed suit against Elite, Dang, and Rahmanian, alleging various causes of action for breach of contract, fraud, and breach of fiduciary duty, among others.  On March 20, 2019, Eastern filed suit against Izadi and KJI, alleging they breached the loan agreement and personal guaranty.  Eastern's action was later consolidated with the suit filed by Izadi.

Appellants' operative complaint in this action is the fourth amended complaint filed on December 28, 2020, alleging eleven causes of action against various parties.  As relevant to this appeal, appellants alleged causes of action for breach of fiduciary duty against Dang and Elite and rescission against Eastern.

III.   *Trial*

The consolidated action was tried to the bench and consisted of ten days of testimony from the parties.  We discuss only the aspects of the trial that are relevant to appellants' claims on appeal.

A.    *Appellants' Expert*

During trial, appellants sought to introduce testimony from their expert, Alan Wallace (Wallace), on the standard of care applicable to business opportunity brokers such as Dang and Elite.  After hearing argument from counsel, the court excluded Wallace's testimony under Evidence Code section 720.  The court held that while Wallace had extensive experience and expertise as a real estate broker, he did not have sufficient experience or training as a business broker to opine as to the standard of care applicable in that field.

8

B.     *Credibility Determination*

At the conclusion of testimony, the trial court determined Izadi's trial testimony lacked credibility.  For example, before closing arguments the court informed the parties that "I don't find Mr. Izadi's testimony to have been credible.  There are a number of reasons for this.  There are multiple instances in the record where he changes his testimony either from the deposition testimony or from moments before when it becomes clear that the question—that the answer that he gave was not in his favor."  The court concluded that "for those reasons, I essentially don't credit his testimony."

The court later made similar findings, stating that "Izadi's testimony at trial largely lacked credibility" and that the court "credit[ed] the testimony of Dang over the testimony of Izadi generally."  The trial court further noted that Izadi had made threats to Rahmanian, her children, and Dang during the litigation, and those threats "cast grave doubt on his credibility."  It also found Izadi's testimony that the laundry's monthly income never exceeded $22,000 was not credible as it was directly contradicted by his own coin count summaries.  The court similarly did not find Izadi's testimony to be credible when he claimed he was not aware of the importance of performing a coin count until after he had taken over the laundry.

C.     *Statement of Decision*

After the trial, the court issued a tentative statement of decision.  This was followed by objections from appellants and further briefing by the parties.  On March 1, 2023, the trial court issued its final statement of decision finding against appellants on all claims, including Eastern's affirmative claims against them.

9

1.    *Breach of Fiduciary Duty against Dang and Elite*

The trial court found against appellants on their claim for breach of fiduciary duty as to Dang and Elite.  In their closing brief, appellants "direct[ed] the Court to CACI 4107 and cases involving real estate transactions as setting forth the elements" of their claim.[9]  However, the court noted that neither the sale of the laundry nor the purchase of new equipment was "a real estate transaction" and appellants "offered no law suggesting that the Court should treat these as real estate transactions."  In the absence of any such authority, the trial court concluded, "It is not at all clear that the specific requirements applicable to real estate cases have any bearing on Plaintiffs' burden here."

The trial court acknowledged that Dang and Elite owed a fiduciary duty to appellants.  However, it concluded that appellants did not put forth any evidence at trial "as to what that duty required or how any duty may have been breached."  Nonetheless, the court turned to the substance of appellants' claim and determined the evidence was insufficient to establish that Dang and Elite breached their fiduciary duty to appellants.  For example, the court determined that "To the extent that Plaintiffs contend that Dang and Elite owed a duty to verify the income numbers proffered by Rahmanian," they had done so by conducting a water analysis.  Dang and

---

[9]    CACI No. 4107 provides "As a fiduciary, a real estate broker must disclose to the broker's client all material information that the broker knows or could reasonably obtain regarding the property or relating to the transaction.  [¶]  The facts that a broker must learn, and the advice and counsel required of the broker, depend on the facts of the transaction, the knowledge and experience of the client, the questions asked by the client, the nature of the property, and the terms of sale.  Brokers must place themselves in the position of their clients and consider the type of information required for the client to make a well-informed decision."

10

Elite offered expert testimony confirming Dang's water analysis was reasonably performed. By contrast, Appellants offered no evidence or authority to show this analysis was deficient or unreasonable.

The court also rejected the theory that Dang and Elite breached their duty to appellants by receiving a "secret" commission on appellants' purchase of new equipment for the laundry. The court determined Izadi "in fact knew Dang and Elite were profiting from the sale of equipment, more so [than] the sale of the Laundry." The court also reasoned that "by the plain terms of the dual agency disclosure, the fiduciary duty applied to the sale of the Laundry only," not appellants' equipment purchase. The court also noted that appellants "offered no evidence as to what the standard of care required Dang to disclose."

The court similarly found that appellants had failed to establish that Dang's failure to renegotiate the lease for the laundry fell below any applicable standard of care.

The court also addressed its exclusion of Wallace's testimony on the applicable standard of care. The court noted that appellants' proffered expert "lacked any expertise in acting as a business broker (in stark contrast to his extensive experience as a real estate broker)." The court found appellants did not establish that business brokers and real estate brokers were bound by the same standard of care, such as to make Wallace's qualifications relevant to the case. The court noted, "Plaintiffs' claim that business brokers must maintain a real estate license does not, in and of itself, demonstrate that the same standard of care applies to both types of brokers."

11

## 2. *Eastern's Claims Against Appellants*

In finding in favor of Eastern on its claims against appellants, the trial court noted that appellants "did not contest liability other than to raise their affirmative claims as defenses." The court determined that appellants did not carry their burden to establish any of their affirmative claims against Eastern. In doing so, the court rejected appellants' argument that Eastern breached the duty of disclosure it owed to them under *Sumitomo Bank of Cal. v. Iwasaki* (1968) 70 Cal.2d 81 (*Sumitomo*). Under *Sumitomo*, a creditor (Eastern) owes a duty of disclosure to a guarantor (Izadi) to disclose facts about the primary obligor (KJI) that materially increase the guarantor's risk beyond what the creditor has reason to believe the guarantor intends to assume. (*Id*. at pp. 90–91.) But the scope of this duty will ultimately depend on "the nature of the risk guaranteed and the relationship of the parties involved." (*Id*. at p. 91.)

In rejecting appellants' argument under *Sumitomo*, the trial court adopted Eastern's argument that it did not have any knowledge about KJI that wasn't already known by Izadi. The court determined that the only information Eastern had regarding KJI came from KJI itself, and that Izadi, as the sole member and sole owner of KJI, had the same knowledge that KJI and Eastern had. The trial court also adopted Eastern's argument that its income projections for the business showed the loan would be profitable enough to repay the loan.

## IV. *Judgment and Appeal*

On April 10, 2023, the court entered judgment in favor of Dang, Elite, and Eastern on appellants' claims. The court also entered a judgment totaling approximately $225,000 in favor of Eastern on its claims against

appellants. Appellants filed a timely notice of appeal. Appellants raise two arguments on appeal: (1) that the trial court misapprehended the scope of the fiduciary duty Dang and Elite owed to them, and (2) that the trial court disregarded the duty of disclosure owed by Eastern under *Sumitomo*.

## DISCUSSION

I.    *Standard of Review*

"On appeal from a judgment based on a statement of decision after a bench trial, we review the trial court's conclusions of law de novo and its findings of fact for substantial evidence." (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.) "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "We may not reweigh the evidence and are bound by the trial court's credibility determinations." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) "[W]e presume that the record contains evidence to sustain every finding of fact. [Citation.] It is the appellant's burden to demonstrate that it does not." (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.) "'The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.'" (*Estate of Young*, at p. 76.)

II.    *Scope of Fiduciary Duty Owed by Dang and Elite*

It is undisputed that Dang and Elite owed a fiduciary duty to appellants in connection with the sale of the laundry. The trial court concluded as much, and no party has challenged that aspect of its ruling on

appeal.  The trial court determined that appellants did not put forth evidence as to the applicable standard of care owed by business opportunity brokers. Appellants argue the trial court incorrectly defined the scope of the duty that Dang and Elite owed as brokers of the sale.  Appellants claim the trial court incorrectly refused to apply the standard of care contained in CACI No. 4107 and improperly excluded the testimony of Wallace, their expert on the standard of care.  Appellants argue the trial court drew an improper distinction between real estate brokers and business opportunity brokers. There are several flaws in appellants' argument.

A. *Appellants Have Not Established Error by the Trial Court*

First, appellants have failed to provide any authority showing that real estate brokers and business opportunity brokers are bound by identical standards of care.  Appellants' entire argument on this point is premised on Business and Professions Code section 10131.[10]  Section 10131 defines a "real estate broker" to include a person who "Sells or offers to sell . . . or negotiates the purchase, sale, or exchange of . . . a business opportunity."  (§ 10131, subd. (a).)  Thus, argue appellants, business opportunity brokers are treated identically to real estate brokers as a matter of law.

But this argument ignores critical language in the statute.  By its express terms, section 10131 sets forth the definition of a "real estate broker" only "within the meaning of this part."  (§ 10131.)  The reference to "this part" means Part 1 of Division 4 of the Business and Professions Code.  Part 1 is titled "Licensing of Persons" and is concerned exclusively with licensing and education requirements for brokers.  (§§ 10000-10580.)  When understood in

_____

[10]    All further statutory references are to the Business and Professions Code unless otherwise specified.

14

this context, section 10131 only provides that business opportunity brokers are subject to the same licensing requirements that apply to real estate brokers. This is reflected in the legislative history of section 10131. "In 1965, the Legislature merged the statute requiring a person acting as a business opportunity broker to be licensed with the section requiring a real estate broker to be licensed. [Citation.] As a result, the definition of 'real estate broker' in section 10131, subdivision (a) was expanded to include 'a person who . . . Sells or offers to sell, . . . or negotiates the purchase, sale or exchange of . . . a business opportunity.'" (*Salazar v. Interland, Inc.* (2007) 152 Cal.App.4th 1031, 1036.) Nothing in section 10131 indicates that real estate brokers and business opportunity brokers are bound by identical standards of care.

Appellants' reliance on CACI No. 4107 for the definition of the applicable standard of care for business opportunity brokers is misplaced. "[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7; accord *People v. Dimacali* (2019) 32 Cal.App.5th 822, 838 ["A pattern jury instruction is not itself the law, and it is not binding"]; *People v. Mojica* (2006) 139 Cal.App.4th 1197, 1204, fn. 4.) CACI No. 4107 itself is not legal authority or evidence of the duty owed by business opportunity brokers.

Moreover, even if CACI No. 4107 was binding authority on the trial court, it is silent as to business opportunity brokers, and only purports to define the standard of care for real estate brokers. It states, in pertinent part, that "As a fiduciary, a real estate broker must disclose to the broker's client all material information that the broker knows or could reasonably

15

obtain regarding the property or relating to the transaction." As it was undisputed that the sale of the laundry business was not a real estate transaction, appellants have not shown that CACI No. 4107 was applicable to this action.

Appellants' argument regarding the exclusion of Wallace's testimony fails for similar reasons. Appellants' argument on this point is premised on the same flawed interpretation of section 10131 that we rejected above. In essence, appellants argue Wallace was properly qualified to opine as to the standard of care for business opportunity brokers because of his qualifications as a real estate broker. In the absence of authority showing business opportunity brokers are treated identically to real estate brokers as a matter of law, appellants cannot establish the trial court abused its discretion in excluding Wallace's testimony. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [we review a trial court's ruling "excluding or admitting expert testimony for abuse of discretion"].)

For these reasons, the trial court did not err in concluding that appellants failed to provide evidence on the standard of care applicable to Dang and Elite.


B.     *Any Claimed Error was Harmless*

Even if we were to adopt appellants' interpretation of section 10131, and accept CACI No. 4107 as binding precedent, appellants' arguments would still fail. Appellants have not shown they were prejudiced by the trial court's error.

The California Constitution generally "prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error

16

prejudicial." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) An error is said to be "prejudicial" when it results in a miscarriage of justice. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108; Cal. Const., art. VI, § 13.) A "miscarriage of justice" will be declared only when the appellate court, after examining the entire case, including the evidence, is of the opinion that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); accord *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) "'The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice.' [Citation.]" (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)

To carry their burden to establish prejudice, it is not enough for appellants to show the trial court applied the wrong standard of care. Instead, they must establish a reasonable probability that the application of the correct standard of care would have led to a different result below. Appellants have not carried this burden.

In their reply brief, appellants argue that, "giving Appellants every benefit of the doubt," the evidence at trial shows: (1) Dang inadequately verified the income projections proffered by Rahmanian by performing a perfunctory water analysis; (2) appellants never agreed to the as-is condition of the laundry business itself and only agreed to accept the laundry's equipment in "as-is" condition; (3) Dang improperly told the escrow company that appellants agreed to an "as-is" sale of the business; (4) Dang failed to discuss and explain the escrow instructions with appellants; and (5) Dang failed to disclose that he stood to gain from appellants' purchase of Continental machines for the laundry. Appellants conclude they were

17

prejudiced because the evidence shows Dang and Elite breached the standard of care owed by real estate brokers.

As an initial matter, we note that appellants appear to misapprehend the nature of our review.  Contrary to their claim, appellants are not entitled to "every benefit of the doubt" in construing the evidence below.  "To the contrary, we presume the judgment is correct and indulge in all inferences in favor of the judgment." (*Aulisio v. Bancroft* (2014) 230 Cal.App.4th 1516, 1527, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  As such, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

Further, the trial court expressly considered and rejected the theories of breach advanced by appellants in their reply brief.  The trial court's statement of decision included factual findings that: (1) Dang's use of a water analysis to verify Rahmanian's income projections was reasonable and supported by expert testimony;  (2) Izadi agreed to the as-is condition of the sale;  (3) Izadi expressly waived any income verification for the business;  (4) Dang fully discussed the escrow instructions with Izadi;  and (5) Izadi was aware of the fact that Dang stood to profit from Izadi's purchase of Continental equipment.  Appellants did not challenge the propriety of these factual findings on appeal and do not claim these findings are not supported by substantial evidence. (*Schmidt v. Superior Court, supra,* 44 Cal.App.5th at p. 582 ["If substantial evidence supports [a trial court's] factual findings, those findings must not be disturbed on appeal"]; *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1328, fn. 9 [issues not raised in opening brief are forfeited].)  Here, the trial court's uncontested findings conclusively

18

negate appellants' claim that Dang and Elite breached the applicable standard of care.

Put simply, appellants have not established a reasonable probability that the trial court would have found in their favor if it had adopted CACI No. 4107 or admitted the testimony of Wallace. We conclude that, even if we assume the trial court erred in defining the scope of Dang and Elite's fiduciary duty, the trial court's uncontested factual findings rendered any such error harmless.

III.    *Duty of Disclosure*

Appellants argue the trial court erred by rejecting their argument that Eastern breached the duty of disclosure it owed to Izadi under *Sumitomo*. As discussed above, appellants bear the burden on appeal of both establishing error by the trial court and demonstrating that the error was prejudicial. (*In re Marriage of McLaughlin*, *supra*, 82 Cal.App.4th at p. 337.) To establish prejudice, it is not enough simply to state that the trial court failed to apply the holding of *Sumitomo*. (*Watson, supra,* 46 Cal.2d at p. 836.) Rather, appellants must show a reasonable probability that the court would have found in their favor on Eastern's claims if *Sumitomo* had been applied correctly. (*Ibid*.)

Appellants' opening and reply briefs do not attempt to make this showing. Instead, appellants simply state in conclusory terms in their opening brief that "where the trial court used the wrong legal road map, the destination it ultimately reached on those disputed facts was invariably undermined." This is insufficient to establish prejudice. (*Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 ["Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest

19

there"]; *People v. Cardenas* (1997) 53 Cal.App.4th 240, 248 ["broad and conclusory assertions of prejudice are not enough; appellant must develop an argument that specifically substantiates his claim"]; *People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887 [merely "asserting in conclusory fashion that [appellant] was prejudiced" is insufficient].)

We need not reach the merits of appellants' arguments given their failure to offer a cogent analysis on the subject of prejudice. "[O]ur duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) This alone compels us to affirm the trial court's judgment in favor of Eastern.

The same result would follow if we were to reach the merits of appellants' argument. The rule from *Sumitomo* is that a creditor owes a duty of disclosure to a guarantor to disclose facts about the primary obligor which materially increase the guarantor's risk beyond what the creditor has reason to believe the guarantor intends to assume. (*Sumitomo*, *supra*, 70 Cal.2d at pp. 90–91.) In other words, *Sumitomo* did not impose a blanket obligation on Eastern to disclose to Izadi all facts it knew regarding KJI. It only required Eastern to disclose facts that materially increased Izadi's risk beyond what Eastern had reason to believe he intended to assume. On appeal, appellants simply presume that *Sumitomo* imposed a duty of disclosure on Eastern, without showing that Eastern knew facts about KJI which "materially increased" Izadi's risk beyond what Eastern had reason to believe Izadi intended to assume.

A review of the record supports the trial court's conclusion that *Sumitomo* does not apply. It is uncontested that Eastern's internal income projections for the business showed it would be profitable enough to repay the loan. Appellants argue that even though Eastern's calculations indicated KJI would be able to repay the loan, Eastern nonetheless had a duty to warn Izadi that there was a risk that KJI would not be able to do so. Under *Sumitomo*, Eastern was only obligated to disclose this fact to Izadi if Eastern had reason to believe that this fact increased Izadi's risk beyond what he intended to assume in accepting the terms of the loan. Here, the trial court made findings of fact that Izadi repeatedly waived a coin count or any other income verification for the business. The court also found that Izadi specifically agreed to the escrow instructions stating there would be no coin count or other income verification for the business and that Izadi was purchasing the business based solely on his own investigation.

From the uncontested factual findings, the trial court could have reasonably concluded that—as far as Eastern was aware—Izadi intended to assume the risk that the laundry's income would be insufficient to repay the loan. The court could have also reasonably concluded that Izadi had failed to demonstrate that Eastern's internal calculations "materially increased" Izadi's risk, given that those projections indicated the laundry would be sufficiently profitable to allow KJI to repay the loan.

The trial court's conclusion that Eastern did not breach its duty of disclosure under *Sumitomo* is supported by substantial evidence. (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299.) For this independent reason, we affirm the trial court's judgment against appellants on Eastern's claims.

21

## DISPOSITION

The judgment is affirmed. Dang, Elite, Eastern, and Rahmanian are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, P. J.

WE CONCUR:


COLLINS, J.


GARCIA UHRIG, J.*

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.