Filed 11/6/25  Daughtery v. Powell CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| CARL DAUGHTERY, | |
| Plaintiff and Respondent, | E083686 |
| v. | (Super.Ct.No. CIVMB2400001) |
| MELODY GLORENE POWELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John W. Burdick, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Melody Powell, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant Melody Powell appeals the grant of a civil harassment restraining order issued pursuant to Code of Civil Procedure section 527.6[1] requiring she

---

[1]  All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

1

keep away from plaintiff and respondent Carl Daugherty, for a period of three years expiring on February 21, 2027.

On appeal, Powell contends the trial court erred by granting the civil harassment restraining order as it was not supported by sufficient evidence. She also insists she was denied her federal Constitutional right to procedural due process. Daugherty has not filed a response. We affirm the grant of the civil harassment restraining order.

**FACTUAL AND PROCEDURAL HISTORY**

Daugherty filed a request for civil harassment restraining order (RRO) against Powell on January 4, 2024, for himself and his spouse, Matthew Jung. Daugherty alleged Powell was his neighbor who lived across the street. He further alleged that "[Powell] is using recording devices all hours day, night and early morning 2am-6am outside our homes front bedroom window." This recording occurred between November 2022 and January 2024. Powell oftentimes stood just outside Daugherty's doors and windows and was consistently using recording devices. She also did slow "drive-bys" in front of their home in her car. Powell at one time advised Daugherty that she had a gun and was not afraid to use it. Daugherty alleged he was harmed by the harassment by "[j]ust the constant stress and anxiety from seeing her standing outside our home at any given moment."

Daugherty was seeking to have the court order that Powell stay at least 100 feet away from the right, left and rear of his home and to keep within 10 feet of her side of the street curb when outside her home. In addition, he sought an order that she stay at least eight yards away from Daugherty, Jung, his home, job and vehicle. Daugherty also

2

alleged that Powell was stalking him. Daugherty alleged that Powell was deemed "5150" by the San Bernardino County Sheriff's Department on July 11, 2023.

Daugherty provided the following written facts. In 2021, Daugherty moved to a planned community in Yucca Valley. He became the vice president of the homeowners association (HOA) for the community in April 2023. Powell moved in across the street, and he and Powell were friendly at first. He helped her with some home improvement projects and had invited her to his home. In November 2022, Powell sent out an email to Daugherty, other members of the community and the HOA board members, which was full of "hate, false accusations and even a bit racist." Daugherty hired counsel to respond to Powell's complaints about him. Powell was asked by Daugherty's attorney to provide proof of the accusations, but she never responded.

In 2023, Powell began making complaints to the San Bernardino County Sheriff's Department that her neighbors had ultrasonic sound waves aimed at her house. She claimed the sound waves caused sounds of footsteps dancing on her roof, and she could hear voices in her home. Sheriff's deputies responded to her calls and spoke with Daugherty and the other neighbors, advising them to document all strange and suspicious behavior from Powell. Eventually, the sheriff's department stopped responding to her calls. Daugherty feared opening the blinds in his home in case Powell was standing outside the window recording him.

On January 5, 2024, a temporary restraining order was granted. The hearing on the permanent restraining order was set for January 30, 2024, and was continued. Powell filed a response to the RRO on February 21, 2024. Powell denied that she owned a gun.

3

Powell provided an attachment to the opposition supplying the reasons she believed that a permanent restraining order should be denied.

Powell insisted that she only walked around the neighborhood on December 29, 2023, with an electromagnetic meter instrument that measures radio frequencies. She explained that she had been experiencing high levels of electromagnetic frequencies in her home. She was instructed by electromagnetic experts to take measurements inside and outside her home to help determine why her home was experiencing such high levels of radio frequency suddenly during her second year of homeownership. She was instructed to take measurements several times a day and during times when there was ambient noise outside. She was 62 years old and had to find the cause of the electromagnetic frequencies or be forced to sell her home because it was impacting her health.

Powell insisted she had not spoken with Daugherty since September or October 2022. In the two years she had lived in her home, she had walked in the neighborhood no more than 12 times. She claimed she could not walk in her neighborhood because she had been bullied by Daugherty and his group of friends. She sent a cease and desist email on November 21, 2022, advising them to stop bullying her.

Powell had taken radio frequency measurements a "few times" since March 2, 2023. She borrowed what she called a SoundCAM on July 15, 2023, from an engineer for the weekend and took videos during the day and night to gather data about the radio frequencies. In September 2023, she downloaded an application to her phone that measured decibel levels and took one or two screenshots of the levels inside and outside

4

her home. It was necessary to measure the levels during the day and night. She purchased her own SoundCAM in September 2023. On December 22, 2023, she purchased an electromagnetic meter to measure the radio frequencies in her home.

Between March 2, 2023, and December 29, 2023, she had taken six to 10 measurements outdoors, mostly from her driveway. She had taken "approximately 2 measurements from across the street walking by 'all' the homes or across street." She recorded the highest measurements near the three homes directly across the street from hers. Daugherty's home had one of the highest measurements. Powell insisted that walking past Daugherty's home on two days was not harassment or threatening behavior. Walking past Daugherty's home was necessary because she had not determined the location of the electromagnetic frequencies.

Powell had advised Daugherty that she was walking by his home to find electromagnetic frequencies. Also, in April 2023, she claimed the sheriff's department asked the neighbors if they had any devices that would be emitting high frequencies. On October 11, 2023, she emailed the HOA board asking for help with finding the high-frequency noise disturbances.

Powell denied that she was following or seeking out Daugherty. Powell alleged that on December 29, 2023, Daugherty noticed her walking by his home and "began taunting [Powell] through his surveillance video system, as he has done on several occasions." She insisted that taking measurements from her driveway and on a public street, 10 times during a period of over 300 days, was not placing anyone in danger and she was not threatening anyone with the use of her measuring device.

5

She insisted she was not tall enough to see inside Daugherty's windows. She also did not know the layout of his home to know where the bedroom windows were located. She had only walked past the front exterior of his home. Her behavior was no different than the neighbors who walked for exercise or walked their pets several times each day past Daugherty's home. She objected to the request by Daugherty that she not be allowed to use any recording devices. The request was made for the sole purpose of preventing her from gathering evidence required for her to present to law enforcement and the court to stop the unlawful use of unapproved, illegal frequencies near her home.

Powell noted that several home inspectors and technicians were unable to find the source of the pulsating frequencies so she purchased her own instrument to find the source. She denied that she did slow "drive-bys" of Daugherty's home. She was simply a slow driver and pulled slowly into her own driveway. She denied that she owned a gun or had threatened Daugherty that she had one. She also had never been placed on a psychiatric hold. Powell also alleged that Daugherty should have to provide video of her standing outside his home every day to prove his accusation.

Powell included a second attachment, which she signed. She again stated that she only recorded frequencies outside her home. Daugherty was not afraid of her as he was always trying to engage with her when she was outside her home. In addition, whenever she had a repair person or technician at her home, he sat outside the front of his home and videotaped her home. She believed that Daugherty filed the RRO because she had refused his invitations to his home. She claimed that Daugherty had convinced all the dog owners in the neighborhood to have their dogs defecate on her lawn. She finally had

6

to send a cease and desist letter to the neighbors to get them to stop. She also alleged that someone was tampering with the outside of her home and her car.

Powell presented a timeline of when she moved in, when problems started with Daugherty, and the start of the high frequencies in her home. She again alleged that someone was tampering with her property and car. Granting Daugherty's RRO would essentially make her a prisoner in her own home and could jeopardize her career. She again denied that she owned a gun. Powell also provided that she had all of the frequency measurements she needed and would no longer be seeking to record the frequencies. She requested that the permanent restraining order not be granted.

Powell attached several exhibits to her response. One was a listing of safe radio frequency levels. She also attached a cease and desist letter that was addressed to Daugherty and several other persons. She complained that on November 20, 2022, Daugherty and other neighbors met to conspire to harass and bully her, and trespassed and damaged her property. Powell sent a letter to Daugherty and the HOA on October 11, 2023, complaining that she was experiencing high and low-frequency noise inside her home. She asked that the HOA send a reminder to homeowners about noise disturbances. She insisted that such high and low-frequency noise could cause long-term damage to the human body. She also attached an email from Susan Brinchman, who was the director of the Center of Electrosmog Prevention. Brinchman had advised Powell about the best ways to find the source of radio frequencies, which included walking in the neighborhood to identify the source of the highest frequencies. She also instructed Powell to take photographs of her meter.

7

Powell also provided photographs of presumably Daugherty's house with persons walking by the front of the house. She provided a photograph of the Electrosmog meter. She provided a photograph of what she claimed was Daugherty, sitting in front of his home watching her and roofing inspectors.

The hearing on the RRO was held on February 21, 2024. Both Daugherty and Powell were present. Powell filed her response to the RRO on the day of the hearing. The trial court took a break so that it could review the response. Daugherty offered a thumb drive with videos and photos, and numerous emails sent by Powell. The trial court asked Daugherty to just tell the trial court about what Powell was doing.

Daugherty expressed that in the videos and photos, Powell could be seen slowly driving in front of his home. He explained she would drive almost right at the curb in front of his home. He offered the videos, but the trial court stated they would be "useless" because it was a senior community and it hoped everyone drove slowly. Daugherty stated that she threatened him by going to the side of his house at all hours of the night with her cellular telephone and in front of the bedroom window holding her phone. Based on her actions, he did not feel comfortable opening the bedroom window. This occurred six to eight times during 2023, starting in March. He was not sure what Powell was doing with her cellular telephone, whether she was taking pictures or videotape. His 12-year-old niece was afraid to sleep in the front bedroom because she had seen Powell outside the window. Daugherty had photographs and video from his front door camera that he offered to show the trial court. The trial court agreed to look at the photographs.

The trial court asked about one of the photographs. Daugherty explained that it showed Powell dressed in black coming from the side of his house and "creeping" around to the front window. The photograph showed Daugherty at the front window. The trial court asked Powell if that was her in the photograph. She responded, "I do take frequency measurements." The trial court asked Powell if she went onto Daugherty's property and she responded, "I do not go onto the property. I just stay." The trial court stated that in the photograph it looked like she was on Daugherty's property. She denied that the dark figure in the photograph was her. Powell denied that she went on Daugherty's property.

The trial court looked at a photograph, which it noted showed her crossing the street towards Daugherty's property.[2] Powell responded that she was following the frequency. She stated, "I'm not necessarily going—his house isn't the only house where I—." The trial court interrupted and indicated that the next photograph showed Powell out in front of Daugherty's house. Powell responded that she was just taking measurements. The trial court described the next photograph as showing her out in front of Daugherty's house, aiming her cellular telephone toward the house. She insisted she was just following the radio frequencies as instructed by the engineers. The next photograph was described by the trial court as Powell looking as though she is filming Daugherty's house. Powell insisted it was an application on her phone that measured

_____

[2] It appears the trial court was looking at photographs and videos from a thumb drive provided by Daugherty, which were shown in court on Daugherty's iPad. The photographs and video were not admitted into evidence and have not been provided to this court.

9

radio frequencies. Powell stated that she had no reason to film Daugherty's house and that she was just taking measurements in various places.

Daugherty then showed a video. The trial court described the video as showing the street in front of Daugherty's house and Powell's house across the street. The trial court asked Daugherty to describe the video. Daugherty stated that it showed Powell coming across the street with nothing in her hands. She disappeared off-camera to look into Daugherty's bedroom window. Daugherty stated that the window had been open. The video was taken during the summer of 2023. The video showed her standing in the driveway. Daugherty insisted she had done the same thing several times. He showed another video of Powell. The trial court noted it was at night and Powell was holding her phone. The trial court asked Daugherty how many other videos he had. He stated probably 20. The trial court asked, "Are they all like that, where she's kind of loitering out in front of your house with your [*sic*] phone." Daugherty responded, "Yes. Yes. It could be day. It could be night. I have photos. I have videos of the police, the sheriff showing up all hours, because then they come to our house, and we get woken up from a nap." Daugherty explained that law enforcement would come to their house because Powell had called about what she claimed were ultrasonic sound waves coming from Daugherty's house. Daugherty insisted law enforcement had found nothing on his property. Daugherty also testified that Powell stood in front of the garage so he could not open it and get out.

The trial court asked Powell to respond. Powell insisted she had never stood in Daugherty's driveway refusing to let him out. She was following the frequencies as

10

instructed by engineers. She denied that she was under the care of a therapist or psychologist. Powell was not the only one who heard the pulsating frequencies; inspectors who had come to her house had documented the noise. Powell advised the trial court that these noises did not start occurring until one year after she moved into her home. It started in March 2023 and had not stopped. She had to find the source of the noise, or she was going to have to move. She was concerned at 62 years old that she would be unable to move and that she may not be able to sell her house with the noise. The trial court thanked Powell.

The trial court stated that it intended to grant the permanent restraining order, which would expire at midnight on February 21, 2027. It included Daugherty's partner, Matthew Jung. Powell was advised not to harass, intimidate, molest, attack, stalk, threaten, assault, hit, abuse, destroy property or disturb the peace of either of them. She was not to contact them. She was to stay 10 yards from each of them, their home, their jobs and their vehicles. It did not prevent her from coming and going from her own residence. The trial court noted, "There's no reason for you to cross over the street on or even their half of the street." She was not to possess any firearms; she again denied she owned a gun. The trial court asked Powell if she understood the orders, even if she did not agree with the order. She indicated she understood. The trial court advised Powell, "So if you violate the orders, it's a crime. So if you're over in front of their house, like I saw, again, you're subject to arrest and being charged with a misdemeanor, disobeying a court order."

11

The written restraining order was issued for a period of three years expiring on February 21, 2027. Powell was ordered to stay 10 yards away from Daugherty, Jung, Daugherty's home, job and vehicle. The trial court ordered that no fee should be paid by Daugherty because the restraining order was based on "unlawful violence, a credible threat of violence, or stalking."

Powell filed her notice of appeal on April 16, 2024. She requested that the record include "Disks 9:00 AM 1 to Disk 2 11:00 AM dated 2/21/2024," which presumably was the thumb drive, but the clerk advised that it was not admitted into evidence.

## DISCUSSION

Powell contends that the factual findings made by the trial court did not support the grant of the civil harassment restraining order. She insists that none of the evidence met the standard in section 527.6 for issuing a restraining order. The evidence did not show a threat of violence, a course of conduct supporting the civil harassment order, or that the harassment was likely to continue. She also insists that her actions were constitutionally protected activity. Powell additionally claims that her federal Constitutional rights to procedural due process were violated.

A.      SUFFICIENT EVIDENCE TO SUPPORT RESTRAINING ORDER

" '[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' [Citation.] 'Consistent with well-established principles governing review for

12

sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Hansen v. Volkov* (2023) 96 Cal.App.5th 94, 104.)

" '[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.' " (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1300.) "[W]e must defer to the trial court's determinations of credibility." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 498 (*Harris*).)

" 'Section 527.6 was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution." [Citations.] It does so by providing expedited injunctive relief to victims of harassment.' " (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227, disapproved on another ground in *Conservatorship v. O.B.* (2020) 9 Cal.5th 989.)

Section 527.6, subdivision (a)(1), provides, "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section." Section 527.6, subdivision (b)(3), defines harassment as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer

13

substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." The statute defines "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1).) "A trial court may infer substantial emotional distress from the nature of the harassing conduct.' " (*E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 704.)

"[A] single act of harassment alone cannot justify a restraining order. An injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future." (*Harris*, *supra*, 248 Cal.App.4th at p. 499.) However, "the statute does not prescribe the necessary number or frequency of the acts required for a finding of course of conduct harassment" and the trial court "views the evidence as a whole" which "cumulatively could constitute a harassing course of conduct." (*E.G. v. M.L.*, *supra*, 105 Cal.App.5th at pp. 699-700.)

The trial court credited Daugherty's testimony, and we must defer to the court's credibility findings. (*Harris*, *supra*, 248 Cal.App.4th at p. 498) Daugherty presented photographs, which are not in the record but were described in detail by Daugherty and the trial court during the hearing, which showed that Powell was standing in Daugherty's driveway. There were also photographs and videos of Powell directly in front of

14

Daugherty's windows, holding a cellular telephone, appearing to be recording or taking photographs. Daugherty also testified that Powell oftentimes went to the side of the house and stood in front of his bedroom window. Daugherty represented that he had at least 20 videos of Powell in front of the house loitering, and holding her cellular telephone, and the trial court accepted the representation. Daugherty also stated that Powell called the sheriff's department, which responded to his house, bothering him and Jung on several occasions. Finally, Daugherty testified that Powell stood in front of his garage so it could not be opened.

The foregoing conduct certainly could be seen as a course of conduct of harassment, which would cause a reasonable person to suffer serious emotional damage. Powell came onto Daugherty's property, and Daugherty was upset that he felt he could not open his windows. Powell insists that she only took measurements of electromagnetic frequencies in the neighborhood on two occasions, which the trial court could not consider a course of conduct. This ignores Daugherty's evidence that she had entered onto his property on multiple occasions. She also claims that Daugherty failed to provide the trial court with the videos of the 20 times that she was outside his home with a phone or measurement device. A close reading of the record shows that Daugherty was prepared to present the evidence to the trial court. The trial court clarified that these videos would show Powell outside of Daugherty's home, and the trial court determined that it was not necessary to review them all. Finally, Daugherty insists that she was engaged in legitimate conduct and that at no point stepped onto Daugherty's personal property. This is contradicted by the evidence presented to the trial court, e.g., the

15

photograph of Powell in Daugherty's driveway and other photographs of her on the property.

The evidence also supports the trial court's implied determination that the harassment would likely recur in the future.  (See *Harris v. Stampolis*, *supra*, 248 Cal.App.4th at pp. 500-501 ["[W]e must presume that the trial court followed the applicable law and understood that it was required to find that future harm was reasonably probable"].)

Powell stated that she was done collecting data on the radio frequencies.  She also testified that the pulsating sounds were still ongoing in her home, and she had to find the source or move out.  The trial court impliedly found that either Powell was videotaping Daugherty's house for some other purpose or was checking for frequencies by trespassing on Daugherty's property.  Although Powell insisted she had collected enough data, she also stated that she was still having problems in her house.  Further, in December 2023, she stated that she had purchased a new meter to be used to find the frequencies.  The trial court impliedly did not believe Powell that she was no longer collecting data and that the harassment was likely to continue without the restraining order.

Finally, Powell insists that her activity was constitutionally protected activity.  Section 527.6, subd. (b)(1) provides that "[c]onstitutionally protected activity is not included within the meaning of 'course of conduct,' " however, in making this argument, Powell relies on her own testimony that she never went onto Daugherty's property.  As stated, *ante,* the trial court was presented with evidence by Daugherty that Powell in fact was on his property.  Powell was not engaged in constitutionally protected activity when

16

she trespassed onto Daugherty's property. (See *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 568 [there is no general First Amendment right to trespass on private property]; see also *Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1390 ["An injunction is an appropriate remedy for a continuing trespass"].) Sufficient evidence was presented to the trial court to support the issuance of the civil harassment restraining order.

B.    PROCEDURAL DUE PROCESS

Powell claims that her constitutional rights were not protected by the trial court. She contends that the Fourteenth Amendment to the federal Constitution requires that each party be given the opportunity to be heard. She was not able to adequately respond to the allegations made against her by Daugherty. She claims that the trial court did not consider her written response and did not allow her an opportunity to present her evidence, in violation of her procedural due process rights.

" ' "The essence of procedural due process is notice and an opportunity to respond." ' " (*Isidora M. v. Silvino M.* (2015) 239 Cal.App.4th 11, 22.) " '[A]lthough the procedures set forth in' Code of Civil Procedure, section 527.6, 'are expedited, they contain certain important due process safeguards. Most notably, a person charged with harassment is given a full opportunity to present his or her case, with the judge required to receive relevant testimony and to find the existence of harassment by "clear and convincing" proof of a "course of conduct" that actually and reasonably caused substantial emotional distress, had "no legitimate purpose," and was not a "constitutionally protected activity" ' before a court issues a restraining order that

17

exceeds the length of the temporary order that provides protection while the parties ready their cases for a hearing." (*D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 635.)

Powell relies on the following exchange with the trial court to support her claim. The trial court stated it was going to grant the restraining order, providing, "It seems to me, by clear and convincing evidence, that you are disturbing the peace of your neighbors." The trial court stated, "From now on the—" Powell interrupted and asked to be heard. The trial court asked, "Ma'am?" Powell repeated, "Can I finish?" The trial court responded, "I'm speaking. Please do not interrupt me. Thank you." Powell also complains that the trial court did not consider her written response to the RRO.

Powell filed her response to the RRO on the day of the hearing. She included two attachments outlining her facts and the reasons that the permanent restraining order should not be granted. She also included exhibits. The trial court specifically took a break to review her response. The record does not support Powell's contention that the trial court refused to consider her response to the RRO, and she does not provide a citation to the record where the trial court refused to consider the response. We must presume the trial court considered the response. (*Gee v. American Realty & Construction Inc.* (2002) 99 Cal.App.4th 1412, 1416 [" ' " A judgment or order of the lower court is *presumed correct*" ' "].)

Moreover, Powell had ample opportunity to present her own evidence. At the hearing, Powell was specifically asked by the trial court to respond to the evidence presented by Daugherty. She responded by providing that she never entered Daugherty's property and that she was just recording radio frequencies. She had to locate the

18

frequencies, or she would have to move.  The trial court thanked Powell.  Powell, at this point, did not continue her argument.  The trial court then stated it was going to grant the restraining order.  At this point, Powell asked to finish.  The trial court advised Powell not to interrupt the court.  Powell had ample opportunity to present her own evidence and has not shown a procedural due process violation.[3]

## DISPOSITION

The civil harassment restraining order issued on February 21, 2024, is affirmed in full.  Powell is to bear her own costs on appeal.[4]  (Cal. Rules of Court, rule 8.278(a)(5).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

---

[3] Powell submitted written oral argument.  This court has considered this argument and finds it was repetitive of the issues raised in the brief and does not entitle her to relief.

[4] We do not award costs to respondent because he did not make an appearance in this court.

19